Jones, J.
 

 Since the original schedules were filed, as stated in the order of the Commission, it conducted an extensive hearing continuing over a number of sessions. The record is very lengthy, consisting of a large number of exhibits and testimony
 
 *273
 
 of various witnesses, including expert engineers employed by the city and tbe telephone company. The Commission had the benefit of its own inspection of the utility plant, as well as of the inspection made and testimony given by its own engineers. Before the final order was made, the Commission had before it the experiences and operations of the telephone company, covering a period of
 
 3y2
 
 years, from the fall of 1920 until July 17, 1924, when the final order of the Commission was made.
 

 In the two cases here presented the Public Utilities Commission is also represented by its own counsel, its attorney general and special counsel having filed a brief wherein the Commission opposes the reversal of its order, whether sought by the city or the utility. Both parties insist that the valuation of the telephone property made by the Commission is erroneous, and each makes sundry claims as to particular items allowed or ignored in making the total valuation upon which the rate base is fixed.
 

 It has been stated that this case has been twice before this court. The first case was decided May 16, 1922, and reported in 105 Ohio St., at page 181, 137 N. E., 36. The journal entry in that case recites that no authoritative opinion was filed therein, “inasmuch as the judges who concur in the judgment in this case do not agree upon the grounds upon which the judgment is put.” After a remand to the Commission, the cause again reached this court, resulting in a decision on March 27, 1923, reported in 107 Ohio St., 370, 140 N. E., 86, wherein this court again remanded the case to the Public Utilities Commission, “to hear and deter
 
 *274
 
 mine according to law the just and reasonable rate to be charged by” the telephone company.
 

 While both parties claim that error intervened in fixing the valuation of the utility upon which the rates are based, the most important claims in that respect are as follows: (1) The city claims that, since the utility carried upon its books a large amount for accrued depreciation, such amount should be deducted from the total valuation of the utility to the extent that such valuation had been increased by new construction and betterments made by the utility. (2) The telephone company claims that error intervened when the Commission ordered that an unlimited subscriber for telephone service should not be required to pay a toll charge to limited subscribers in other zones, and ordered a refund of all toll charges collected therefor.
 

 While other errors are claimed, and will be alluded to in this opinion, it is only upon the first of the two claims referred to that members of this court are in serious disagreement. The claim of the city that no statutory examination was made as a basis for these rate schedules is not now important. The city cannot complain of that fact, since the record discloses that the telephone company requested such a valuation, and the city opposed it. In that connection the order of the Commission recites:
 

 “The inventory produced by the company of its physical property has been accepted as sufficiently accurate to make a valuation. This inventory has not been challenged in any way by the city — in fact has been adopted by the city’s experts — and, heretofore, was high-spotted by the
 
 *275
 
 Commission’s engineers, so that the Commission feels justified in accepting it.”
 

 Furthermore', the city in its application for a rehearing before the Commission did not urge that a statutory valuation was relied on and denied, as is required by Section 543, General Code.
 

 The ultimate question for our decision is: Has the telephone company established by proper proof the justness and reasonableness of the rates and charges filed in its schedules, which were to become effective August 1, 1920? The determination of that question largely rests upon the fact whether a proper and fair value has been placed upon the utility’s property used and useful to the public. This telephone company is a utility of some importance, operating not only in one of the largest cities of the state, but with an extension of its plant to other communities in outlying territory. As shown by its findings, which are fully supported by the evidence, the fair value of this property was found by the commission to be as follows:
 

 Physical property, less depreciation ________________ $15,387,094.00
 

 Overheads, including working capital, materials, and supplies ($450,000.00) ________ 1,846,451.00
 

 Total valuation ________________________________________________ $17,233,545.00
 

 The city claims that the reserve for accrued depreciation, as shown by the company’s record, has been invested in plant in 11 years, beginning with January 1, 1913, and ending December 31, 1922; and that in the 11-year period the company has accumulated an excess of $3,712,759 in the account “reserve for accrued depreciation” which has been invested in plant. Therefore it is claimed that, although the previous earnings of - this company
 
 *276
 
 had been invested in new construction and betterments, giving value to the plant, and being used and useful to the public, that sum should be deducted from its entire valuation as found by the Commission. The telephone company claims that, in addition to replacements, it has added thereto new property actually costing $3,162,444, as disclosed by the record. The Commission found that “net additions and betterments” amounting to $2,-921,149' had been made by the telephone company between August 1, 1920, and May 1, 1923.
 

 The record discloses that ordinary depreciation of its plant had been taken care of by the utility, and that on August 1, 1920, the Commission found that “its present condition is 92 per cent, of its reproduction cost new.” If said sum of $3,712,759, which is about 21% per cent, of the total valuation, should be deducted from the total valuation of the Commission, the question becomes vitally important to the utility, since, without such deduction, the findings of the Commission disclose that from actual experience and operation, covering a period of 3% years, the utility would have been able to earn from 3.29' per cent, minimum to 5.668 per cent, maximum on the net investment of its property actually used and useful during the years 1920 to 1923, inclusive, if the 5 per cent, annual depreciation accorded it by the Commission were allowed.
 

 Section 614-23, General Code, provides that when the Commission shall be of opinion “that the maximum rates, charges, tolls or rentals chargeable by any such public utility are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the Commission shall,
 
 *277
 
 Avith due regard among other things, to the value of all the property of the publ-io utility
 
 actually
 
 used and useful for the convenience of the public * * * fix and determine the just and reasonable rate, fare, charge, toll, rental or service to be thereafter rendered, charged, demanded, exacted or collected for the performance or rendition of the service.” The value of the utility property which is
 
 actually
 
 used and useful for the convenience of the public is the valuation, under the Ohio act, upon which the base rate is fixed. What that value should be, and how it may be determined, has been frequently decided in both state and federal courts. The federal rule upon that subject was announced in
 
 Smyth
 
 v.
 
 Ames,
 
 169 U. S., 466, 18 S. Ct., 418, 42 L. Ed., 819, where the court held that, while various elements were to be considered in ascertaining the reasonableness of rates, what the company is entitled to ask is a fair return upon that which is employed for the public convenience. This case has frequently been commented upon by the high federal court, but the rule announced has been adhered to in later and very recent decisions of the Supreme Court of the United States. The following cases hold that there must be a fair return upon the reasonable value of the property, which is to be determined at the time the inquiry is made:
 
 Willcox
 
 v.
 
 Consolidated Gas Co., 212
 
 U. S., 19, 52, 29 S. Ct., 192, 53 L. Ed., 382, 15 Ann. Cas., 1034, 48 L. R. A. (N. S.), 1134;
 
 Minnesota Rate Cases,
 
 230 U. S., 352, 454, 33 S. Ct., 729, 57 L. Ed., 1511, 48 L. R. A. (N. S.), 1151, Ann. Cas., 1916A, 18;
 
 State, ex rel. S. W. Tel. Co.,
 
 v.
 
 Public Service Commission,
 
 262 U. S., 276, 287, 43 S. Ct.,
 
 *278
 
 544, 67 L. Ed., 981, 31 A. L. R., 807;
 
 Georgia Ry. & Power Co.
 
 v.
 
 Railroad Commission,
 
 262 U. S., 625, 43 S.
 
 Ct.,
 
 680, 67 L. Ed., 1144;
 
 Bluefield Waterworks & Improvement Co.
 
 v.
 
 Public Service Commission,
 
 262 U. S., 679, 43 S. Ct., 675, 67 L. Ed., 1176.
 

 Those oases sustain the principle that the return is based upon the fair value of the net investment of property used and useful, without deduction of any depreciation, save that existing at the time of inquiry.
 

 The Commission in its finding says:
 

 “The inventory produced by the company of its physical property has been accepted as sufficiently accurate to make a valuation. This inventory has not been challenged in any way by the city — in fact has been adopted by the city’s experts — and, heretofore, was high-spotted by the Commission’s engineers so that the Commission feels justified in accepting it.”
 

 It recites that as to the various valuations it “has given consideration and weight to the experience and qualifications of the various witnesses produced both by the company and the city.” It accepted the testimony of disinterested members of the real estate board of Cincinnati as to the value .of the land; the testimony of a witness produced by the city as to the reproductive value of the buildings. It accepted the percentages of accrued depreciation of the buildings, testified to by one Miller, a witness for the company, and the values of physical property (other than land, buildings, and right of way), testified to by various engineers, especially one Snook, produced by the city. ‘Various witnesses, the Commission recites, Avere in sub
 
 *279
 
 stantial accord as to the 8 per cent, accrued depreciation. Eight per cent, accrued depreciation was deducted by the Commission, thus leaving its present condition at 92 per cent, of its “reproductive cost new.” While the Commission did not have before it express testimony as to the “amounts actually paid” for the various items constituting “overheads” in producing the property, it allowed a percentage of T2 per cent, of the value of the physical property for items of “overheads” composed of allowances for engineering, administration and legal expenses, liability insurance, taxes and interest during construction,' and working capital, including materials and supplies, $450,000— the overheads totaling $1,846,451.
 

 While but little challenge is made that the physical valuation of this property as found by the Commission is excessive, it is urged that since more than $3,000,000 were added to the property for new construction and betterments out of the former earnings of the company, the public should not be made to pay a rate based upon the amount so expended, because of the fact that an excess reserve depreciation account was carried upon the books of the company. No claim is urged that the so-called depreciation reserve account represented moneys or credits that were appraised by the Commission in, making up its valuation. The fact is that the current annual depreciation of the property was taken care of by the company, and its earnings not required theref or were applied to new constructions, additions, or betterments. Whether the moneys upon the books of the company appeared, as alleged by counsel, in the accrued depre
 
 *280
 
 ciation account, or in the company’s surplus, it was company money. Not only had the company the right to expend it in making additions to its plant, but the Ohio law explicitly gives it that authority.
 

 ¡Section 614-50, General Code, provides as follows :
 

 “The moneys in such fund [depreciation] may be expended in new construction, extensions or additions to the property of the public utility.”
 

 That section provides that the fund may be used, (a) for renewing, restoring, replacing, or substituting depreciated property; or (b) may be expended in new construction, extensions, or additions of its property. These expenditures, from whatever account, increased the plant investment, and on August 1, 1920, were property used and useful serving the public, who received the benefits of the betterments and extensions of the utility’s telephone service in the Cincinnati area and its outlying exchanges. If the moneys expended had been borrowed by the company and applied to new construction, we apprehend that no such claim as is now made would be advanced, even though the alleged item of “accrued depreciation” appeared upon the books of the company. The company, instead of paying out the money to its stockholders as dividends, merely used it as part of the stockholders’ investment. By that method there was no necessity of borrowing or of issuing further capital to accomplish that purpose.
 

 Counsel for the city claims that the sum in the account “reserve for accrued depreciation,” and invested in the plant, amounted to more than $3,-000,000. Whether this is true or not is unim
 
 *281
 
 portant. As a matter of fact, the Commission finds that between August 1, 1920, and May 1, 1923, a period of two years and nine months, sums aggregating $2,921,149' were expended in additions and betterments to the utility plant. But it is claimed that the company had no right to expend its previous earnings in additions and betterments to the plant, for the reason that it was equivalent to a capitalization of earnings received from consumers in the past; and it is also urged that this is sustained by the fact that in 1920, and previously, dividends of 8 per cent, or more had been paid to the stockholders upon the capital stock of the company. In 1920 a dividend of 8 per cent, was paid upon a capitalization of about $8,000',000, but, in fact, because of appreciation of values, and of additions and betterments, the Commission found that the valuation bn August 1, 1920, was more than $17,000,000. While the history of the company, including its ability or inability to earn a profit, is an element that might receive consideration in fixing a rate, it does not justify the deduction of earlier profits from the net investment of a utility in ascertaining what the fair valuation should be. Excess, capitalization or under capitalization cannot be used as a basis of determining the valuation of property.
 
 City of Knoxville
 
 v.
 
 Knoxville Water Co.,
 
 212 U. S., 1, 29 S. Ct., 148, 53 L. Ed., 371.
 

 In the case of
 
 City of Minneapolis
 
 v.
 
 Rand,
 
 285 F., 818-823, the Circuit Court of Appeals of the Eighth Circuit, citing cases in its support, announced this rule:
 

 “The claim that past profits justify a present
 
 *282
 
 rat© that is not reasonable is no more tenable than the converse contention that if a public service corporation has operated at a loss in prior years, it is therefore entitled to more than a reasonable present rate of return in order to make up for past deficits.”
 

 In
 
 Newton, Atty. Gen.,
 
 v.
 
 Consolidated Gas Co.,
 
 258 U. S., 165, at page 175, 42 S. Ct., 264, 267 (66 L. Ed., 538), Mr. Justice MeReynolds, delivering the opinion, said:
 

 “Mere past success could not support a demand that it continue to operate indefinitely at a loss. The public has no such right in respect to private property although dedicated to public use.”
 

 In
 
 Erie City
 
 v.
 
 Public Service Commission,
 
 278 Pa., 512, 123 A., 471, the Supreme Court of Pennsylvania held that because “property of a gas company was secured largely from earnings received from ratepayers does not change its status as private property so as to eliminate it from consideration in fixing the total value of the company property as the rate base.”
 

 To the same effect is the decision of the three judges in
 
 Monroe Gaslight & Fuel Co.
 
 v.
 
 Michigan Public Utilities Commission
 
 (D. C.), 292 F., 139.
 

 In this respect the argument of the city is specious. Surely there can be no valid reason which requires those who were stockholders on August 1, 1920, to be penalized because the stockholders of earlier years permitted the earnings to be placed in plant extension, instead of drawing them out in dividends. Likewise, should stockholders of earlier years receive heavier dividends than wise business policy permitted, this would not justify
 
 *283
 
 the requirement that present stockholders should suffer by a refusal to grant them a reasonable rate based upon the present fair value of the plant used and useful to the public. Nor would the fact that a deficit resulted, and stockholders received no dividends in former years, justify an unreasonable rate in 1920 in order to recoup the deficit sustained. An extreme case might be conceived, where, during a long term of years, by the liberal allowance of depreciation, the book item for “accrued reserve depreciation” would become equal to the value of a newly built and larger plant, all of it constructed out of its meantime earnings. In such event could it be claimed that because the larger plant investment had been constructed and paid for out of the earnings of its original parent, covering a period of years, the public would be entitled to substantially free rates or charges because the new investments were paid for out of the former earnings?
 

 If out of the sum of $5,000' earned by a utility in earlier years, $2,000 were applied to replacement of worn-out or depreciated property, and the balance, or $3,000', were invested in new buildings, betterments, or extensions, can it be reasonably argued that the added betterments should not be valued?
 

 The claim of counsel for the city leads to a
 
 reductio ad abswrdum.
 
 If it be conceded that the rates paid by earlier consumers were higher than they should be, we are unable to see any valid reason why the present consumers should profit at the expense of the earlier. Had the former earnings of the utility not been expended in new construe
 
 *284
 
 tion and betterment of the plant, but still remained in its treasury to an amount in excess of necessary working capital, certainly such an amount would not enter into the valuation of the utility. It would not be part of the utility’s property “used and useful for the convenience of the public.” It should not be added to the plant valuation as a basis to obtain an increase of rates. Likewise, should stock dividends be issued against such earnings, resulting in no addition to the plant, that would not affect its valuation, since its property would remain unchanged thereby. There is no evidence sustaining any claim that the so-called “reserve for accrued depreciation” entered into the valuation or was considered part of the property. It was in no wise considered by the Commission as a plant asset furnishing a rate base. Were we to consider the wisdom of a policy investing a utility’s earnings in its extensions and betterments, in order to meet the growing demands for the public service, we believe that would naturally be the wise and prudent policy whereby such earnings would be invested in the plant rather than paid out as dividends to stockholders. At best, the balance in the account “reserve for accrued depreciation” is merely an item of bookkeeping. What the allowance for depreciation should be is usually left to the sound judgment of the utility.
 

 One of the engineers testified:
 

 “The reserve for accrued depreciation is not a fund in which certain moneys are set aside. It is the effect of accounting machinery that is set up to show the facts with respect to depreciation; that is, to show the amount set aside for depreciation as of any particular period. The actual money,
 
 *285
 
 however, is not set aside in that fund and specifically devoted to the particular purpose, but it finds its way into the general funds of the company. ’ ’
 

 The same view is taken in the per curiam opinion of Judges Denison, Tuttle, and Simons, in
 
 Monroe Gaslight & Fuel Co.
 
 v.
 
 Michigan Public Utilities Commission, supra,
 
 at page 147. They say a retirement reserve “of this kind is not a fund in hand; it is a bookkeeping estimate of depreciation which accrues beyond and above the amount kept good by repairs and replacements.”
 

 In this particular case 5 per cent, per annum was allowed by the Commission for future annual depreciation, and it deducted 8 per cent, for actual observable depreciation. But eventualities might arise where the depreciation reserve might be heavily depleted by disastrous storms such as recently occurred, sweeping over five or more nearby states, playing havoc with telephone properties, much of which is peculiarly subject to casualties arising therefrom.
 

 The case of
 
 N. Y. Telephone Co.
 
 v.
 
 Prendergast
 
 (D. C.), 300 F., 822, 825, 826, decided less than a year ago, approved the principle that the entire book reserve for depreciation should not be deducted from the fair value of the utility’s property. The three federal judges sitting in that case rendered a per curiam opinion, in the course of which they said:
 

 “To deduct from the fair value of plaintiff’s property the entire book reserve for depreciation, in order to reach a rate base, was error of law. In point of fact the property had not depreciated that
 
 *286
 
 much; the Commission did not find any such depreciation. ’'
 

 That federal court, adverting to the fact that the Commission held that the utility was bound by its own book figures representing its reserves, said of the Commission’s contention:
 

 “This is merely untrue; the book charges represent what observation and experience suggested-as likely to happen, with some margin over. The legal error is in not recognizing that the law requires deduction only for actual depreciation, just as actual as the present value, and the extent of that depreciation must be ascertained by the same kind of evidence ; in the last analysis, opinion based on contemporary investigation. The rule enforced by the Commission would cause some alarm, if a catastrophe of nature instantly produced a deterioration of 50 per cent, when the book reserve was but half that amount; yet a real estoppel must always be mutual, and it is a poor rule that does not work both ways.”
 

 While counsel for the city and company are in disagreement as to the deduction of the entire accrued book depreciation account from the net plant investments, the state in the brief filed by its Attorney General sanctions the view which the state Commission has uniformly taken, and which this court approves. The Attorney G-eneral states:
 

 “An unbroken line of authoritative decisions support the action of the Commission in including the plant constructed from reserve for accrued depreciation as the property of the company and to be included in valuation.”
 

 While we have referred to the sections of the Ohio Utility Act authorizing the utility to expend
 
 *287
 
 the depreciation reserve for new construction, extensions, and betterments, and its further requirement that the Commission should value the property. used and useful as of August 1, 1920, it might be well to refer to the various authorities sanctioning the rule approved by this court.
 

 The city solicitor places reliance upon
 
 Railroad Commission of Louisiana
 
 v.
 
 Cumberland Telephone & Telegraph Co.,
 
 212 U. S., 414, 29 S. Ct., 337, 53 L. Ed., 577, Mr. Justice Peckham delivering the opinion of the court. It is sufficient to say that the question here under consideration was not decided in that case. Mr. Justice Peckham distinctly says, on page 425, (29 S. Ct., 362):
 

 ' “We are not considering a case where there are surplus earnings after providing for a depreciation fund, and the surplus is invested in extensions and additions. We can deal with such a case when it arises. ’ ’
 

 Every court which has considered the opinion of Mr. Justice Peckham has stated that the language used in that opinion was not intended to and did not apply to the instant question.- He was considering the question of the burden of proof, lie-citing the decision of the 'Circuit Court, wherein the latter stated that counsel for the telephone company had not undertaken to indicate the sum “earned in the business and reinvested in the business,” he held that the burden of proof was upon the complainant telephone company; and it not having sustained the burden of proof upon that issue, the learned justice used the language in the opinion carefully excluding the point here under consideration. The
 
 Cumberland case
 
 was decided 16 years ago. Since that time other courts of this
 
 *288
 
 country, both federal and state, have sustained the principle that the account for reserve depreciation should not be deducted from the total valuation of the plant, where such valuation was enhanced by additions and extensions made out of the earnings of the company.
 

 In the case of
 
 Michigan Public Utilities Commission
 
 v.
 
 Michigan State Telephone Co.,
 
 228 Mich., 658, 200 N. W., 749, the Supreme Court of Michigan, composed of eight judges, held, one judge dissenting :
 

 (5) “Depreciation fund maintained by telephone company is definitely the property of the utility, and not of the public. ’ ’
 

 (8) “Telephone company has the right to invest depreciation fund and earn on it, and such fund should not be deducted from present fair value in fixing rate bases.”
 

 In that case the state Commission had stated in respect to the depreciation fund:
 

 “It is derived from rates paid by subscribers and users of its service, and, not having been obtained by capital contributions from stockholders, but from the public through earnings or revenues, the public ought not to be charged rates to pay a return to the company upon that which they themselves had contributed.
 

 “ ‘The accrued depreciation reserve paid by the public and reinvested in plant or property should not be made the basis of return to the stockholders. The total present value of the company’s property should be decreased in the proportion which such reserve for depreciation bears to the total investment of the company, to ascertain the basis of return to the stockholders.’ ”
 

 
 *289
 
 The Michigan Supreme Court then held that since the depreciation fund had been expended upon extensions and betterments for the property, the state commission had acted erroneously in deducting $9',500,000 from the value of the property, and that the fair valuation without the deduction should be restored. Chief Justice Clark of the Michigan court commented upon the language of Mr. Justice Peckham in the
 
 Cumberland case,
 
 and cited, among other cases,
 
 Monroe Gaslight & Fuel Co.
 
 v.
 
 Michigan Public Utilities Commission
 
 (D. C.), 292 F., 139. The opinion in the latter is a
 
 per curiam
 
 by Justices Denison, Tuttle, and Simons, wherein they say:
 

 “The utility carried upon its books a depreciation account, which (after a correction directed by the Commission), January 1, 1923, amounted to about $37,000. This was called a ‘retirement reserve.’ In its answer the Commission says: ‘Included in the item $272, 000, above mentioned, was property paid for by the use of the reserve fund, or retirement fund of the utility; a retirement reserve of approximately $39,000 being reinvested in the property.’ ”
 

 The federal court proceeds:
 

 “The Commission does not definitely undertake to deduct this retirement reserve from the present fair value of the property, but there is a suggestion that such deduction might be made. We think this is an entire misapprehension. An account of this kind is not a fund in hand; it is a bookkeeping estimate of depreciation which accrues beyond and above the amount kept good by repairs and replacements. It appears in the list of assets only because it represents a supposed loss of capital (or
 
 *290
 
 of accumulations); and if the capital stock is carried as a liability at par, along with undivided profits and surplus, then the depreciation must appear upon the other side of the account. If the bookkeeping estimate is accurately made, it will precisely balance the actual difference between the present value of the depreciated items and the future cost of proper replacements or substitutions. If the estimate is liberally made, there will be a surplus above the true amount of actual depreciation, just as there is here a surplus or difference of about $11,000 between the Commission’s engineer’s estimate, as applied to prudent investment cost, and the defendant’s books. The existence of such a surplus on the books has little evidential force. It means only that at the rates which have been charged, the company has collected that amount in addition to what now appears to be the true amount of depreciation plus the amount which it has seen fit to pay out in fixed charges and dividends, or carry as surplus and undivided profits. The idea that such a depreciation account or retirement reserve, which grew up through the collection of lawful rates, is some sort of a trust fund in which the ratepayers are interested and upon which the utility has no right to earn a return, which idea has found favor with some commissions (although the Michigan Commission has not indicated its adherence thereto), is without foundation. The fact that such excess, along with what is called surplus or undivided profits, has been invested in further property, does not deprive the utility of its full right to earn a return thereon.”
 

 In view of the fact that the Supreme Court of the United States has uniformly decided that a
 
 *291
 
 public utility is entitled to reasonable, nonconfiscatory rates upon property used, and which is useful to the public, based upon a fair valuation determined as to the time of the inquiry, citation of further authorities in support of that principle is without value.
 

 The basic question has been succinctly stated in
 
 Georgia Ry. & Power Co.
 
 v.
 
 R. R. Comm.,
 
 262 U. S., 625, 43 S. Ct., 680, 67 L. Ed., 1144, wherein the opinion quotes from
 
 Willcox
 
 v.
 
 Consolidated Gas Co.,
 
 212 U. S., 19, 52, 29 S. Ct., 192, 200 ( 53 L. Ed., 382, 15 Ann. Cas., 1034, 48 L. R. A. [N. S.], 1134), that it has been clear “that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase.” These decisions accord with the provisions of the Ohio Utility Act (Section 499-9[P], General Code), which require the State Commission to ascertain “the net value as of a date certain, of all physical property other than land owned by such utility * * * to be derived by deducting the sum of the amounts of depreciation from the sum of the new reproductive costs.” The Commission explicitly followed this statute. This court has heretofore held that this sub-section governs; that not book depreciation but depreciation on “the actual condition of the property at the time” controls.
 
 Lima Telephone & Telegraph Co.
 
 v.
 
 Public Utilities Commission,
 
 98 Ohio St., 110, 119, 120 N. E., 330.
 

 Since the date of the Commission’s final order, the case of
 
 Ohio Utilities Co.
 
 v.
 
 Public Utilities
 
 
 *292
 

 Commission of Ohio,
 
 45 S. Ct., 259, 69 L. Ed., —, decided by the United States Supreme Court on March 2, 1925, has settled some of the controversial questions arising in this case. That case involved rates based upon the valuation of a small electric property located at Hillsboro, Ohio. There the Public Utilities Commission made a valuation “based on reproductive value less depreciation.” It allowed, as it did in this case, 5 per cent, for annual depreciation, and also overhead items, composed of taxes and interest during construction, working capital, and supplies. The Commission had rejected outright the item for preliminary organization, and reduced its engineers’ estimates of items for interest during construction, working capital, and its engineers’ valuation of the buildings and plant equipment.
 

 This court is in substantial accord in holding that the State Commission committed no error in this case in the allowance of 5 per cent, for annual depreciation, or in the allowance of 2 per cent, for omissions and contingencies and 12 per cent, for the enumerated “overheads.” There is ample evidence in the testimony and exhibits justifying those allowances. The chief attack upon the items comprising the “overheads” is based on the fact that, while the Commission found “that there is no doubt but that there is an actual expenditure for these various items,” there was no express testimony “as to the amounts actually paid for these various items.” However, basing its finding on the testimony of the engineers, it allowed as overheads “a sum equal to 12 per cent, of the value of the physical property.”
 

 
 *293
 
 In respect to the contention of the plaintiff in error that there was no express proof of the amounts “actually paid” for these “overheads,” we desire merely to quote from the opinion of Mr. Justice Sutherland, upon that feature, found in the
 
 Ohio Utilities Co. case, supra.
 
 There he said:
 

 “The item of $5,000 seems to have been rejected upon the ground that there was no proof of actual expenditure. Reproduction value, however, is not a matter of outlay, but of estimate, and should include a reasonable allowance for organization and other overhead charges that necessarily would be incurred in reproducing the utility. In estimating what reasonably would be required for such purposes, proof of actual expenditures originally made, while it would be helpful, is not indispensable. * * * That such expenditures in a substantial amount would necessarily be made in reproducing the utility is clear.”
 

 See, also, in this connection, the
 
 Monroe Gaslight & Fuel case, supra.
 

 On the hearing before the Commission the city questioned the 4% per cent, contract which the utility had with the American Telephone
 
 &
 
 Telegraph Company for certain facilities which the latter had provided for the utility.
 

 There is nothing to indicate bad faith or the improper exercise of discretion on the part of the utility in making this contract; nor that the amount paid therefor was so exorbitant as to indicate bad faith upon the part of the utility’s directors. In the absence of these elements, the utility has the right to. control and manage its
 
 *294
 
 own affairs. Similar contracts with utilities have been recognized by the United States Supreme Court in various cases, and recently, in
 
 State ex rel. S. W. Telephone Co.
 
 v.
 
 Public Service Commission,
 
 262 U. S., 276, 288, 43 S. Ct., 544, 67 L. Ed., 981, 31 A. L. R., 807. Our own state court has approved a like contract made under similar circumstances in
 
 City of Cleveland
 
 v.
 
 Public Utilities Commission,
 
 102 Ohio St., 341, 347, 131 N. E., 714.
 

 The record discloses that, in the hearing before the Commission, counsel for the city stated to the Commission that he felt “personally that the
 
 4y2
 
 per cent, is not exorbitant. I am not making a fight on that.” However, he thought that the 4% per cent, should be apportioned between operating expenses and capital investment. This suggestion did not receive the approval of the Commission, nor does it meet with the approval of this court. Manifestly, such allocation cannot be made since the 4% per cent, became a part of the operating expenses of the company.
 

 For the reasons stated herein, so much of the final order as is complained of by plaintiff in error in cause No. 18777 is hereby affirmed.
 

 Cause No. 18779.
 

 In this cause the utility instituted proceedings in error seeking a reversal of a portion of the final order of the Commission made July 17, 1924. While various grounds of error upon the part of the Commission were assigned in the utility’s application for the vacation of such order, in the brief the chief reliance of counsel for the utility rests upon the following alleged errors: (a) That the Commission failed to recognize “going con
 
 *295
 
 cera” as an element of value in the valuation of the utility’s property; (b) that' the Commission erred ini holding that the utility’s substituted or supplemental schedule, effective May 1, 1923, was unlawful and discriminatory, that the toll charges stipulated therein should be discontinued by the utility and free toll service supplied between unlimited subscribers and subscribers who had limited service, and that all toll charges collected thereunder should be refunded; and (c) that by the Commission’s own concession in its final order the yield of return on the found valuation of the property was confiscatory.
 

 (a) “Going concern” value. As to this feature it may be said that the application made for a rehearing by the utility on August 15, 1924, did not contain the specific claim that “going concern” had not been taken into consideration in fixing the valuation, as required by ¡Section 543, General Code. Evidently the Commission’s attention was not called to that question, neither does its finding make any reference thereto. In that respect the utility occupied the same position as did the city when it failed to specify, in its application for rehearing, the assignment that a statutory valuation was not made. It has been repeatedly held that “going concern,” a live plant distinguished from a dead one, should be taken into consideration in fixing the rate base of the utility.
 

 In its final order, while the Commission does not specifically refer to the item of going value, we are of the opinion that this was considered by it and properly included in the item denominated “overheads,” amounting to $1,846,451. Included in that
 
 *296
 
 amount was an allowance for ‘ ‘ engineering, administrative and legal expenses, liability insurance, taxes and interest during construction.” All of these entered into the development of the utility’s property and gave it am added value which was not represented in the valuation of the physical property. It is one of the methods followed by the Commission, justified by the principles enunciated in federal cases.
 

 “Included in going value as usually reckoned is the investment necessary to organizing and establishing the business which is not embraced in the value of its actual physical property. In this case, what may be called the inception cost of the enterprise entering into the establishing of a going concern had long since been incurred. * * * When, as here, a long established and successful plant of this character is valued for rate-making purposes, and the value of the property fixed as the Master certifies upon the basis of a plant im successful operation, and overhead charges have been allowed for the items and in the sums already stated, it cannot be said, in view of the facts in this case, that the element of going value has not been given the consideration it deserves.”
 
 Des Moines Gas Co.
 
 v.
 
 City of Des Moines,
 
 238 U. S., 153, 165-171, 35 S. Ct., 811, 815 (59 L. Ed., 1244).
 

 In
 
 City of Houston
 
 v.
 
 Southwestern Bell Telephone Co.,
 
 259 U. S., 318, 325, 42 S. Ct., 486, 489 (66 L. Ed., 961), the court said:
 

 “Whether going concern value should be considered and allowed at all in determining the base for rate making, and if allowed what the amount of it should be, depends upon the financial history
 
 *297
 
 of the company
 
 (Galveston Electric Co.
 
 v.
 
 Galveston,
 
 258 U. S., 388), and it is impossible for us to determine whether the requisite history for deciding this question is to be found in the three large volumes of the transcript of the record of the ease, containing 1,664 pages, without reading the whole of it.”
 

 We find ourselves in substantially the same situation appearing in that case. This record is also very voluminous, and but a small part thereof printed. It is not improbable that the Commission gave full consideration to that item in making up the valuation. Nor the reasons stated this contention of the utility is denied.
 

 (b and c) These two features of the utility’s claim may be considered together. The Commission found that the rates designated in schedule P. U. C. 0. No. 2, filed by the utility with the Commission, to become effective August 1, 1920, other than toll charges therein and thereafter filed, were sustained by the proper burden of proof, and were just and reasonable. However, the Commission found that the toll charges designated in the utility’s filed substituted schedule of April 11, 1923, were “unreasonable and unjustly discriminatory practice.” The Commission not only ordered the utility’s discontinuance of the collection of such charges, but ordered a refunder of all tolls collected th.ereund.er after May 1, 1923. The utility now contends that upon the face of the final order of the Commission the return yield of 3.29' per cent, of the total valuation of the property is confiscatory, especially in view of the fact that this percentage will be further reduced by the refunder of
 
 *298
 
 the toll charges collected by the utility under its schedules. The Commission found the total valuation of the property to be $17,233,545. The amount of return after annual depreciation for the period of one year ending August 1, 1920, was $567,518, representing but 3.29 per cent, available after interest and dividends.
 

 The order of the Commission recites that the annual income or total revenue includes the toll charges collected and ordered to be refunded. Counsel for the utility claimed in their brief that such was the fact, and it is not denied by the city. Such being the case, the return, of 3.29 per cent, would necessarily be reduced, as would the other percentages of return found by the Commission from the actual experience of the company for the later periods. The Commission found that after allowance for annual depreciation the total net income available for interest and dividends yielded but 3.29 per cent, plus in 1920; from the later actual experience of the company it found that the net yield in 1921 was equivalent to but 4.29 per cent, of the total value of the property; in 1922, but 5.39 per cent, plus; and in 1923, 5.668 per cent. With the refunders ordered these percentages would be further reduced. There can be no doubt that if the valuation was fairly made the return yield, especially that for 1920, would amount to a confiscation of property. This brings us to the thresh-hold of a unique situation developed after the original schedules were filed on June 25, 1920. In the meantime the case had been twice before this court.
 

 On April 11; 1923, the utility filed substituted schedules, including certain toll charges to become
 
 *299
 
 effective May 1, 19*23. These schedules were filed by consent of the parties and received the approval of the Commission; but all questions of rates, charges and refunders were reserved for future determination. The previous decisions of this court no doubt led to the consent entry. We are of opinion that the utility thereby chose to rest upon what it thus designates as a substituted toll service, and especially upon that which required tolls to be paid for communications between unlimited and limited subscribers in the different zone areas. The company’s brief sanctions this view. Therein, its entire attack is directed against the action of the Commission in condemning the practice- of “charging subscribers to universal service in one zone a toll for communicating with a limited subscriber in another zone,” under its filed schedules of April 11, 1923. Finally, the order of the Commission held:
 

 “While it is a proper practice for the company to allow and provide for an optional service at a lesser cost to those subscribers who select the limited service and to charge such a subscriber a toll when he communicates outside of the optional district, the practice of the company in charging a subscriber, who subscribes for the universal or unlimited service, a toll when this latter subscriber attempts to call one with the limited service is an unjust, unreasonable and unjustly discriminatory practice.”
 

 The Commission accordingly ordered the utility to refund “to all of such universal, or unlimited, subscribers in Hamilton county all tolls collected from such subscribers from May 1, 1923, to the
 
 *300
 
 date when such practice is discontinued, for calls to subscribers in Hamilton county, having the optional, or limited, service.”
 

 Under the foregoing order, while it found that a limited subscriber who had secured a lesser rate might be charged a toll for communicating with an unlimited subscriber outside of his zone, the Commission held it was a discriminatory practice to charge a subscriber to the universal service a toll for communicating with a limited subscriber in another zone. A schedule which classifies service between an unlimited or universal subscriber and one who contracts for service at a lesser rate is lawful and reasonable. The subscriber who chooses a service at a lesser cost naturally should not be placed on an equality with one who chooses a greater service at a higher cost. The former would procure an incoming message, under the Commission’s order, without any charge therefor. The unlimited subscriber is not required to pay a toll for communicating with another unlimited subscriber, although in a different zone. Why should he be permitted to obtain free toll service for a communication with a limited subscriber through the medium of ah outgoing call and be denied the privilege if the' call is an incoming one — the latter practice being sustained by the Commission? In actual practice and in ordinary business communications one may have as much value as the other. But the limited subscriber is given free toll service on communications to him.
 

 We hold, therefore, that the practice condemned by the Commission is a reasonable and lawful one, and not discriminatory, and that the Commission
 
 *301
 
 erred in ordering its discontinuance and in requiring a refunder of toll charges collected thereunder after May 1, 1923. That error is accentuated by the fact that otherwise the return would be confiscatory. Upon that feature Are cite the folio-wing cases:
 
 Bluefield Waterworks
 
 v.
 
 Public Service Commission, supra,
 
 and
 
 Ohio Utilities Co.
 
 v.
 
 Public Utilities Commission of Ohio, supra.
 

 "What amounts of toll charges (other than those collected since May 1, 1923) have been collected we are unable to determine. The Commission, in its order, realized that the work “necessary to determine the amount of such refunders -will be excessive and that considerable time would be required” to determine the amount. This court therefore reverses so much of the Commission’s order as relates to the aforesaid toll charges collected after May 1,1923, and remands the cause to the Commission for determination of the tolls theretofore collected. We are of opinion, since- the substituted schedule measures the full claim advanced by the utility, that it should not receive further allowance in rates in this proceeding, especially since the record discloses that in 1923 its rate of return has been substantially advancing.
 

 Case No. 18777:
 
 Order affirmed in part.
 

 Jones, Matthias, Day and Robinson, JJ., concur.
 

 Marshall, C. J., Allen and Kinkade, JJ., dissent.
 

 'Case No. 18779:
 
 Order reversed in part.
 

 Marshall, C. J., Jones, Matthias, Day, Allen, Kinkade and Robinson, JJ., concur.