Allen, J.,
 

 concurring. This case arises as an error proceeding to an order of the Public Utilities Commission. On April 8,1926, pursuant to Section 614-20, General Code, plaintiff in error, the Portsmouth Gas Company, filed with the commission its schedule P. U. C. O. No. 6, effecting certain increases in the rates for natural gas in the city of Portsmouth and its vicinity, the rates being intended to take the place of rates theretofore in effect for some five or six years. The commission later, in accordance with statute, entered upon an investigation in respect to the reasonableness of the proposed rates. In this investigation hearings were held from time to time, at which the commission took testimony with regard to the fair value 6f the utility’s property used and useful in the service of the public in Portsmouth and vicinity. This same property had been theretofore valued as of the date of January 15,1920, in a rate proceeding, the reproduction value of the property in that case being found to be $582,-988.40, and the present value $397,502.76. In that case the commission made an actual detailed appraisement, which was adopted with no objections being filed by either the city or the company. The record shows that in the years 1921 and 1925 the fol
 
 *26
 
 lowing number of feet of mains have been laid: 3-incb mains, 5,910 feet; 4-inch mains, 7,251 feet; 6-inch mains, 360 feet. During the same period the gross additions amounted to $53,509.43, and retirements amounted to $4,743.05. .
 

 The present plaintiff in error, the Portsmouth G-as Company, acquired the plant and utility about August 15, 1925, by voluntary purchase.
 

 Upon December 20, 1926, the commission found the tentative value of the property as a whole, as of May 10, 1926, to be as follows: Reproduction value, $692,420.69; present value, $599,441.02.
 

 The company protested this valuation and a further hearing was had upon the protest. Upon consideration of all of the evidence, the commission found its tentative valuation to be incorrect, and ordered its final valuation to be as follows: Reproduction value, $688,437.94; depreciation, $94,216.91; present value, $594,221.03.
 

 Both the tentative and final valuations carried on substantially all items, except real estate, tools, furniture and fixtures, and transportation equipment, an overhead of 17 per cent.; on the tools the overhead was 2% per cent.; on furniture, fixtures, and transportation equipment, % per cent.; and upon the total of the physical valuation testified to by its engineer, increased by the percentage of overheads above given, the commission added for organization, preliminary engineering, legal expense, interest and taxes during construction, omissions and contingencies, 7 per cent.
 

 In considering the protest of the company and the city, the commission rejected in the item of land $15,000 for the site of the proposed holder on Second
 
 *27
 
 street, and $4,000 for the site of the proposed regulator on Gallia street, finding that such property was not used and useful in furnishing the city of Portsmouth its gas supply, and by reason of that and an adjustment in the value of the street mains there was a reduction in the allowance for intangibles and overheads of $871.33.
 

 The company’s vice president and engineer had allowed $22,909 for cash working capital. The commission increased the working capital by $8,099, allowing for working capital $31,008.
 

 On the question of going concern value, as such, the majority of the commission found, and so stated, that the protest of the company was not well taken, “for the reason that going concern value inherent in said plant has been duly considered, recognized, and included within the items 'composing said valuation and the allowances for overheads and intangibles and is fairly, reasonably, and truly reflected and shown thereby. ’ ’
 

 The present company has no franchise, and owns no source of supplies, being a distributing company only.
 

 The great majority of the pipes have been under the ground and in use in the city of Portsmouth for over 50 years.
 

 The principal errors assigned in the record are:
 

 (1) That the commission based both its tentative and its final valuation largely upon the testimony of its own engineer.
 

 (2) That the commission erred in rejecting $19,-000 of the valuation on certain real estate.
 

 (3) Insufficient allowance for overheads and intangibles.
 

 
 *28
 
 (4) That the commission, made no allowance for going concern value.
 

 The utility urges vigorously' that the commission erred in accepting the testimony of its own engineer as a basis for the valuation, evidently discounting some of the testimony of the experts adduced by the utility. Section 499-11, General. Code, provides that the commission, during the making of the valuation, and after the completion thereof, shall “keep itself informed through its engineers.”
 

 It has never been the law that the weight of the evidence is to be determined by the greater number of witnesses, and in utilities cases this doctrine has been emphasized by this court. In
 
 Lima Telephone & Telegraph Co.
 
 v.
 
 Public Utilities Commission,
 
 98 Ohio St., 110, 120 N. E., 330, it was urged that'the commission had disregarded the testimony of the experts produced by the company. The court says, at page 126 (120 N. E., 332):
 

 “It is apparent that the commission in this case had no other purpose than to arrive at the reasonable and just valuation of the property used or useful to furnish the service, and no reason is pointed out why an expert selected by it should be, or was, otherwise than wholly disinterested, or that he should or did have any desire to put other than the proper value on the property. ’ ’
 

 The experts of the utility, while well qualified in experience and education, had not had the opportunity to make the detailed investigation of the property that was made by the commission’s engineer, Mr. Pierce. Mr. H. M. Taylor, one of the utility’s experts, is a non-resident of Ohio. lie spent two days in Portsmouth examining the property and sev
 
 *29
 
 eral days in calculating the valuations. Neither Edward L. Cheney nor William Henderson has" ever been in Portsmouth: Mr. Sam Wyer, a most eminent engineer, made comparisons of unit prices in the exhibit of Taylor, who spent two days in Portsmouth, with the commission’s engineer, and subscribed to Taylor’s figures. Mr. Pierce, on the other hand, has within five years already made two appraisals of this property, spending weeks of his time going over the plant. In the appraisal he made for the valuation as of January 15, 1921, no objection was filed either by the city or by the company to the appraisal. Pierce’s unit prices in 1920 correspond closely with the unit prices used by Mr. Butter-worth, the vice president and general manager of the company, in the present valuation, and the value set by the commission in 1920 upon the basis of those unit prices was some $200,000 less than the instant valuation. Pierce’s figures were.by no means always lower than those of the utility. He adopted the estimate made by the vice president of the utility of the necessary amount of working capital. He stated that more wrought iron pipe was necessary than did the company’s vice president and engineer, and hence estimated a higher price for pipe than this expert for the company, because he based his estimates upon wrought iron instead of upon steel.
 

 Under the doctrine of
 
 Lindsey
 
 v.
 
 Public Utilities Commission,
 
 111 Ohio St., 6, 144 N. E., 729, and
 
 Lima Telephone & Telegraph Co.
 
 v.
 
 Public Utilities Commission, supra,
 
 this court should not under these circumstances disturb the commission’s order.
 

 While the value of the plant was fixed at $397,-502.76 in 1920, with no objection being .filed by the
 
 *30
 
 company to the appraisal upon which it was based, and with only 14,000 feet of additional mains laid since then, according to the statements furnished by the utility’s engineer, and gross additions amounting to $53,509.43, the commission in 1926 allowed an increase in valuation of about $200,000 upon a showing made by the company of only a net expenditure for actual construction cost of about $50,000. In this connection it is significant that, although the record shows that this property was acquired by the present holder in 1925, in a voluntary purchase, the company refused to reveal what price was paid.
 

 Did the commission err in rejecting $19,000 of the valuation upon the real estate? The record shows that the land in question is not intended to be used under the present proposed rates. Mr. Sutterworth, the company’s vice president and engineer, mates the following statement with reference to this question:
 

 “Q. Would that be possible at the rates in effect previous to those now in effect under bond? A. No, sir; if we would build that holder right, on the face of it, it would be necessary to charge something like between 2% and 3 cents a thousand feet more than we have even proposed charging in this case, showing that we do not contemplate building that holder under that rate, but we stand ready to build that whenever we would be allowed to build it.”
 

 The holder site is the site of the old Portsmouth G-as Company, which has been abandoned for a long period of time. There are two structures upbn the property, a brick structure occupied by a bottling plant and a rented dwelling house. Since the record shows that it is not now contemplated, under the
 
 *31
 
 rate sought to be established in the instant action, to erect a holder upon this site, the site is not used or useful at the present time, and the commission was justified in eliminating this item from the valuation.
 

 The same conclusion arises with regard to the regulator and meter site. A rented residence occupies the larger part of this lot, and the commission acted properly in sustaining the reduction.
 

 As stated by Spurr, Principles of Public Service Regulation, Volume 2, p. 80:
 

 “That property which has been superseded or abandoned and is no longer used in the public service should not be included in the valuation of public utility property is recognized by the Supreme Court of the United States on the ground that this constitutes depreciation.”
 
 City of Knoxville
 
 v.
 
 Knoxville Water Co.,
 
 212 U. S., 1, 29 S. Ct., 148, 53 L. Ed., 371.
 

 The utility also urges that an insufficient-allowance was made for overheads and intangibles. On the appraisal it was shown that the following allowance is made:
 

 “Organization, preliminary engineering, legal expense, interest and taxes during construction, omissions and contingencies, 7 per cent.”
 

 An allowance is also made for overheads in the various items upon which this 7 per cent, is calculated, which runs to' 17 per cent, upon all items except real estate, tools, furniture, fixtures, and transportation equipment.
 

 The record gives no testimony whatever of the actual expense incurred in organization, in the erection of the plant, and in the building of the business.
 
 *32
 
 This company or its predecessor has been in operation for a period of over 50 years. Obviously, whatever expenses were incurred in organization, preliminary engineering, legal expense, interest and taxes during construction, omissions and contingencies on the original establishment of the business, have long since been defrayed out of the rate paid for the gas.
 

 Bearing in mind the fact that the inception cost of the enterprise had long since been incurred, the allowance for overheads was not too-small..
 
 Des Moines Gas Co.
 
 v.
 
 City of Des Moines,
 
 238 U. S., 153, 35 S. Ct., 811, 59 L. Ed., 1244.
 

 The company asks that taxes paid during construction be fixed at $9,692, while the total tax paid for the year 1926 upon the entire utility property is $8,570.35.
 

 An allowance is also demanded'for the cost of capital for reconstruction. Such capital is not now being raised, and, when-raised, over 50 years ago, no doubt its cost was defrayed from the rates paid by the public. The situation which obtains when a utility is a producing company and has been but recently organized is entirely different from the situation which obtains when the utility is a distributing company only, not a producing' company, and has been operating for a long period of years. The actual expense of preliminary financing has by this time been absorbed in the prices paid for the gas.
 

 An allowance for hypothetical brokerage fees based on the percentage customarily obtained by bankers for financing such enterprises should not be allowed.
 
 Galveston Electric Co.
 
 v.
 
 City of Galveston,
 
 258 U. S., 388, 42 S. Ct., 351, 66 L. Ed., 678.
 

 The fair value of the plant should not be esti
 
 *33
 
 mated upon a basis of impecuniosity and exactions, but upon tbe theory, if used, of reconstruction, by those financially able to build the plant, paying reasonable prices therefor.
 
 City of Minneapolis
 
 v.
 
 Rand
 
 (C. C. A.), 285 F., 818.
 

 The allowance for overheads made by the commission in this instance therefore seems to me not to constitute error. »
 

 The utility also urges that the commission erred in making no specific allowance for going concern value. The commission in its report fixing the final valuation said that:
 

 “Going concern value inherent in said plant has been duly considered, recognized and included within the items composing said valuation and the allowance for overheads and intangibles, and is fairly, reasonably and truly reflected and shown thereby.”
 

 This subject has been fully considered and determined in the case of
 
 Hardin-Wyandot Lighting Co.
 
 v.
 
 Public Utilities Commission,
 
 118 Ohio St., 592, 162, N. E., 262, decided May 9, 1928, to which case reference is made for reason and authority. In
 
 City of Cincinnati
 
 v.
 
 Public Utilities Commission,
 
 113 Ohio St., 259, 148 N. E., 817, the court said that while the item of going concern value was not specifically referred to, it was considered by the court and, properly included in the item denominated “Overheads.” Included in that amount, just as in the instant valuation, was an allowance for engineering, administrative and legal expenses, liability insurance, taxes, and interest during construction.
 

 The confusion with regard to this question of going concern seems to have arisen because of the decision of the Supreme Court of the United States
 
 *34
 
 in the case of
 
 McCardle et al., Commrs.,
 
 v.
 
 Indianapolis Water Co.,
 
 272 U. S., 400, 47 S. Ct., 144, 73 L. Ed., 316. However, as pointed ont in
 
 HardinWyandot Lighting Co.
 
 v.
 
 Public Utilities Commission, supra,
 
 the
 
 McCardle case
 
 affirmed a valuation which contained no specific allowance for going concern. It affirmed a valuation based upon the cost of reproduction new, less depreciation, as estimated by the commission, as of the time of the rate hearing. Professor Whitten, in his valuable work upon Valuation of Public Service Corporations (2d Ed., 1928), in an exhaustive study of the
 
 McCardle case,
 
 points out that the authorities cited upon the question of going value in the
 
 Indianapolis Water case
 
 in general do not sustain the proposition urged here by the plaintiff in error that in every case a 10 per cent, allowance for going concern must be made in addition to a valuation based upon reproduction cost new of the plant as a complete whole, less depreciation.
 

 Whitten also points out significant decisions of the Supreme Court not mentioned by Mr. Justice Butler in connection with his discussion of going value, and never overruled by the Supreme Court of the United States, as follows:
 

 “Wilcox
 
 v.
 
 Consolidated Gas Co.,
 
 212 U. S., 19, 29 S. Ct., 192, 53 L. Ed., 382, 15 Ann. Cas., 1034, 48 L. R. A. (N. S.), 1134, where good will was excluded, nothing was included for going value, and only franchise value of a limited amount under special circumstances allowed.
 

 “Cedar Rapids Gas Light Co.
 
 v.
 
 Cedar Rapids,
 
 223 U. S., 655, 32 S. Ct., 389, 56 L. Ed., 594, where no separate amount for going value was allowed.
 

 
 *35
 

 “Galveston Electric Co.
 
 v.
 
 Galveston,
 
 258 U. S., 388, 42 S. Ct., 351, 66 L. Ed., 678, -where nothing was allowed for going value.
 

 “Houston
 
 v.
 
 Southwestern Bell Telephone Co.,
 
 259 U. S., 318, 42 S. Ct., 486, 66 L. Ed., 961, where nothing was allowed for going value.
 

 “State of Missouri ex rel. Southwestern Bell Telephone Co.
 
 v.
 
 Public Service Commission,
 
 262 U. S., 276, 43 S. Ct., 544, 67 L. Ed., 981, 31 A. L. R., 807, where ‘cost of establishing the business’ was excluded from the value found by the court, even though the Missouri commission had allowed 10 per cent, for intangibles when it built up a rate case on a different theory.
 

 “
 
 Georgia Railway & Power Co.
 
 v.
 
 Railroad Commission,
 
 262 U. S., 625, 43 S. Ct., 680, 67 L. Ed., 1144, where an item amounting to 10 per cent, of the value of the physical property had been allowed for going value by the commission and was passed by the pourt against the company’s contention that it should be much more, and a claim for accumulated losses during recent years was rejected entirely.”
 

 A careful consideration of Mr. Justice Butler’s opinion in the
 
 McCardle case
 
 demonstrates that the Supreme Court of the United States did not in that decision lay down the proposition that 10 per cent, was to be allowed for going concern in every case where the valuation of a public utility was the issue. No such statement is made in the decision, and all that Justice Butler does say is that under the impressive facts of this record 9% per cent, is not too much to allow for going value and
 
 water rights.
 
 It cannot be too strongly emphasized that the issue in the
 
 McCardle case
 
 was whether the valuation was
 
 *36
 
 based upon trend prices too low in the average, and, since the allowance affirmed contained no item for going concern, that case is not authority for always allowing going concern value as a specific item.
 

 Plaintiff in error strongly urges in this connection that general overheads are part of the physical property, that going concern is an element of value separate and apart from the physical property, and that hence going concern cannot be included in the general overheads. This court has already held upon this proposition that the allowance of general overheads such as were employed in this case does include an allowance for going concern.
 
 City of Cincinnati
 
 v.
 
 Public Utilities Commission,
 
 113 Ohio St., 259, 148 N. E., 817. In that case the court, quoting from
 
 Des Moines Gas Co.
 
 v.
 
 City of Des Moines, supra,
 
 called attention to the fact that:
 

 “What may be called the inception cost of the enterprise entering into the establishing of a going concern had long since been incurred” — a statement which is true of the present case.
 

 It is to be conceded that the general overheads do constitute an allowance for direct construction in connection with the physical property. They also, however, constitute an allowance for establishing the business. In the words of this court, in the
 
 Cincinnati case, supra,
 
 such overheads enter into the development of the utility property and give it an added value not represented in the value of the physical. property.
 

 However, the plaintiff in error then urges that the 7 per cent, allowance for general overheads is purely arbitrary and must be disregarded in view of the testimony of the utility’s engineers that such an al
 
 *37
 
 lowanee should be somewhere in the neighborhood of 20 per cent.
 

 The natural interest of the utility’s engineers may properly be taken into consideration by the Public Utilities Commission in weighing the evidence; Now the members of the commission are themselves experts upon matters of valuation. Every working day in the year they are vitally concerned with problems of engineering and financing of public utilities. Their allowance is based upon their experience. It constitutes an estimate just as worthy of consideration as the estimate of the utility’s experts, and upon this question we should not disturb the finding of those who have been selected by the state to handle these problems.