*111
 
 Hart, J.
 

 The cities assign 15 claimed errors, but all may be grouped and considered under the subjects covered by arguments and briefs of counsel, and this court will consider and treat the assigned errors in that manner.
 

 The cities complain that the company employed a staff of 210 men to make an appraisal of its property, whereas the commission employed only 15 to 20 members of its staff to do the work in this case. However, it is shown by the record that such- members were experienced men who made the usual checks made in rate cases. The chief engineer of the commission testified that in the valuations of the company’s property the staff examined the large items comprising from 60 to 70 per cent of the depreciable property, spot-checked other property but did not examine specifically such items as booths, special fittings, teletypewriters, buried cables, public address equipment or the 1,384,000 telephones in service.
 

 On the other hand, it is disclosed that valuations were arrived at by consideration of book cost; that rights of way were valued at book cost which was less than present reproduction cost; that land values were determined by local real estate appraisers; and that the company’s books are kept in accordance with the uniform system of accounts prescribed by the Federal Communications Commission and adopted by the commission for the use of telephone companies subject to the jurisdiction of the Federal Communications Commission.
 

 The accuracy of these book cost figures was not challenged by the cities and no evidence was offered to refute them. And this is likewise true as to all property valuations.
 

 In this connection it must be observed that the functions of the commission in a rate case are largely
 
 *112
 
 governed by statute; that the commission may require public utilities to furnish and keep on file with the commission data of .all kinds useful for regulatory purposes; and that, although it is the duty of the commission to make investigations and secure valuation .and depreciation data for its use in such cases, the burden of furnishing challenging evidence in these matters rests upon the objectors in such cases. In this respect, no such evidence was introduced by the cities in this case.
 

 One of the major and most important considerations in fixing public utility rates is the determination of a rate base. In this case the commission found the intrastate valuation of the company’s property for rate base purposes to be $291,416,835.
 

 This sum included an item of $4,403,633 for working capital to which the cities objected. They contend that, although in the case of many public utilities a fund for working capital is a necessity because cash must be advanced in the business of such utilities to meet current expenses, yet in the case of a telephone company, where the users’ monthly bills are known in advance and, as the cities claim, are paid in advance, the cash needs for current expenses are met by such advances.
 

 This claim was wholly unsupported by the evidence. Although the exchange service is billed and presumably paid in advance, none of the toll service charged by the company is so paid. The commission, for many years, has allowed for this element of value in telephone rate cases a sum equal to one-twelfth of the amount of annual operating expenses, less operating taxes and annual depreciation expenses. This rule was followed in the instant case and the propriety of its application was fully supported by the evidence. In fact, the evidence showed that the average working cash of the company required for the years 1939
 
 *113
 
 through 1947 was $1,104,000 in excess of the average monthly expenses, and that,- excluding the war years, such average working cash required was $273,000 in excess of such average monthly expenses. The evidence showed that the company operates 170 exchanges in the state of Ohio, employs more than 17,000 persons, and that its actual wage payments exceed $4,000,-000 per month.
 

 The cities cross-examined the company’s witness who furnished this data from company records but made no inquiry regarding the subject of working capital. The allowance of such an item as a part of the rate base has long been the practice and has been recognized by this court.
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission,
 
 127 Ohio St., 109, 187 N. E., 7.
 

 Throughout the hearing of the instant case, great stress was laid by the cities on the intercorporate and business relationships of the company, American and Western to show that in their dealings with each other they could not act independently, competitively or at arms length.
 

 The evidence disclosed that the Bell system operating throughout the United States consists of American, 19 controlled operating companies, 3 noncontrolled operating companies, Western, Bell Telephone Laboratories, Inc., and 195 Broadway Corporation. The evidence showed also that the capital stock of most of the controlled operating companies, including the company and Western, is almost wholly owned by American ; that ever since the company was organized all its capital funds have been furnished by American; that all the operating companies, including the company, have license contracts with American, whereby they are authorized to use all Bell operating licenses and patent rights owned by American, for which license fees are paid; that Western is the manufacturer of all required telephone equipment and substantially all the
 
 *114
 
 equipment and materials used by the company are purchased from Western; and that the prices for such equipment and materials are determined by Western.
 

 At the outset, it must be observed that, although the relationships of American, Western and the company, as herein disclosed, call for scrutiny as to whether the relationships and intercompany transactions of these companies result in unfairness, exploitation and unconscionable gains at the expense of the public, the mere existence of such relationship cannot stand as proof of such facts. If there is such unfairness or exploitation it must be shown by evidence in the case.
 

 A similar situation existed in the case of
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission, supra,
 
 wherein this court, quoting from the opinion of the Supreme Court of the United States in the case of
 
 Western Distributing Co.
 
 v.
 
 Public Service Commission of Kansas,
 
 285 U. S., 119, 76 L. Ed., 655, 52 S. Ct., 283, said:
 

 “ ‘Where, however, they constitute but a single interest and involve the embarkation of the total capital, in what is- in effect one enterprise, the elements of double profit and of the reasonableness of intercompany charges must necessarily be the subject of inquiry and scrutiny before the question as to the lawfulness of the retail rate based thereon can be satisfactorily answerd. * * * It is enough to say that in view of the relations of the parties, and the power implicit therein arbitrarily to fix and maintain costs as respects the distributing company which do not represent the true value of the service rendered, the state authority is entitled to a. fair showing of the reasonableness of such costs, although this may involve a presentation of evidence which would not be required in the case of parties dealing at arm’s length and in the general and open market, subject to the usual safeguards of bargaining and competition. ’ ’ ’
 

 In the first place, Western manufactures a large por
 
 *115
 
 tion of the telephone equipment sold in the United States and sells to other companies outside the Bell system. The limits of this opinion preclude a complete detailing of the evidence bearing upon the fairness of Western prices to the company for telephone equipment. In general, there was evidence tending to show that Western prices for many items of material were considerably lower than those of other manufacturers of the same material; that in comparison Western profits, currently and for a period of years, are and were generally less than those of other manufacturers in comparable lines of business; that for the years 1946 and 1948 the average general trade prices for comparable station apparatus were much higher than Western’s prices to Bell customers; that Western prices to Bell customers for all types of telephone instruments were at all times lower than the lowest general trade price for corresponding instruments; and that Western’s profits for the period 1925-1947 were considerably lower than those of the 50 largest manufacturing corporations of the country.
 

 The cities offered no evidence to directly refute this evidence but were content to point out certain apparent discrepancies in the testimony or exhibits offered by the company, which in turn were subject to various explanations by witnesses for the company.
 

 The cities contend that the commission complacently accepted the evidence produced by the company in face of information that a special committee of the National Association of Railroad and Utility Commissions was studying the matter of Western’s prices and sales to Bell companies, and that there had been filed by the Attorney General of the United States a proceeding against Western and American. These matters were not in evidence in the instant case. In the course of its finding, as it relates to this subject, the commission said:
 

 
 *116
 
 “We are aware that the subject of Western Electric prices of material to affiliated Bell System companies is currently being studied by a special committee of the National Association of Railroad and Utilities Commissioners in behalf of the state regulatory commissions of the United States (including this commission) and in conjunction with the Federal Communications Commission, and further that certain legal proceedings have been instituted by the Attorney General of the United States involving Western Electric and American Telephone & Telegraph Company. These proceedings however do not provide us with facts upon which we can predicate a judgment as to the validity of the cities’ allegations.”
 

 In concluding on this subject, the commission said:
 

 “In the event that the investigations and studies above referred to should establish that the public interest would be served by a reconsideration of this aspect of the case, the commission has adequate authority to do so. ”
 

 The court finds no prejudicial error in the finding of the commission on this phase of the case.
 

 One of the chief components of a rate base is the value of the physical property of the public utility used and useful in rendering utility service. By virtue of the provisions of Section 499-9, General Code, the commission is obliged to adopt the “reproduction cost new less depreciation” formula in determining the value of the physical property other than land of a public utility.
 
 City of Marietta
 
 v.
 
 Public Utilities Commission,
 
 148 Ohio St., 173, 179, 74 N. E. (2d), 74. In the determination of such value under the formula prescribed, the amount of the existing or observed depreciation of the property becomes an important factor. If existing depreciation resulting from mechanical deterioration, age, obsolescence, or lack of utility is fixed in an insufficient amount the
 
 *117
 
 result is an inflated valuation of usable property as a part of the rate base to the disadvantage of the ratepayers.
 

 The commission found the percentage condition of the physical property of the company to be 84.32 per cent and the corresponding existing depreciation of such property to be 15.68 per cent. The cities complained that this ratio was out of proper proportion and did not represent the actual value and depreciation of the physical property of the company, and that the commission failed to make independent investigation as to these items but accepted the reports and findings of the company thereon. The cities claim also that in a correct determination the depreciation must be separated from maintenance cost. Depreciation is the expense (or loss) occasioned by the using up of physical property employed as fixed capital, whereas current maintenance is the expense occasioned in keeping physical property in the condition required for continued use during its service life. It is claimed that if abnormal maintenance cost is charged to operating expenses, there should be a reflected decreased depreciation allowance. In other words, it is claimed that if more outlay for maintenance is charged to current expenses, it should result in substitutions of new for worn-out equipment and should tend to keep down accrued depreciation. Operating expenses should not be overburdened by these two not easily determinable items of expense.
 

 It is disclosed that in 1942 the company’s maintenance expenses were $10,047,668 whereas its depreciation charges were fixed at $8,036,041; in 1946 maintenance expenses were $15,813,022 and depreciation charges $8,784,669; and in 1947 maintenance expenses had risen to $19,319,927 and depreciation charges had likewise gone up to $9,546,577. The cities claim that the company could not have legitimately expended
 
 *118
 
 $19,000,000 for maintenance and at the same time place in the reserve fund about $10,000,000 for depreciation for the year 1947.
 

 The determination of physical depreciation is always a difficult matter. At best, it is an estimate. No one can predict with certainty the serviceable life of equipment, or the time when it may become too inefficient for continued use. It is true the commission in the main found that the existing depreciation of the telephone property of the company was as the company’s witnesses testified, but the testimony of these witnesses was full and complete on that subject and followed the requirements of the statute to the effect that the determinations of the existing depreciation must be attributable to specific causes such as age, obsolescence, lack of utility, mechanical deterioration and other causes of existing depreciation. The commission staff checked the records and actually inspected 60 to 70 per cent of the property in testing the accuracy of the proof on this phase of valuation.
 

 On this subject the secretary’s report states:
 

 “The commission’s engineers made an independent observed depreciation survey during the period April 1 to July 2, 1948, covering properties in all parts of Ohio. This survey included 171 buildings in 139 communities, 32,384 poles, 13,662 crossarms, 159,669 wire spans, 21,969 cable spans, 35,619 drops, 28 openings of buried cable, central office equipment at 246 locations, 450 private branch exchanges, 1,855 vehicles, 222 items of heavy construction equipment, and furniture and office equipment in 22 large buildings.
 

 “For each group of property inspected, the weighted average condition found by the commission’s engineers was equal to, or better than that determined by the company. ’ ’
 

 As a result of these examinations the commission found that the claims of the company in these respects
 
 *119
 
 were fully substantiated and in many instances tbe commission adopted tbe valuations supported by tbe witnesses for tbe company. This occurred where the company’s valuation figures were lower than those found by the commission resulting in the adoption of the lower figures. No evidence was offered to the contrary. In this connection it should be observed that one unusual element of depreciation of certain types of property in this case arose from the fact that old equipment was carried through and after the war years to such extent that it was both obsolescent and worn beyond the point of continued use, but had not yet been replaced with new and modern equipment.
 

 The cities in their brief say:
 

 “It is clear that the court should return the entire case to the commission ordering it to make the necessary investigations and studies, to go into all problems thoroughly, and fix and determine a just and reasonable rate.”
 

 It must not be overlooked that this is an appeal on questions of law, and that it must be shown that the findings and determinations of the commission are unreasonable or unlawful before this court, under the law, may reverse the commission’s order and remand the cause, as a whole, for the correction of errors. Until it is shown that the commission has erred in its findings in some specific matter, the court cannot order such a remand. The cities failed to produce any substantial evidence to substantiate their complaints in this particular, and this court, consequently, is not warranted in remanding the cause.
 

 One of the most vital controversies in this case relates to the proper creation and maintenance by the company of a “reserve fund for depreciation” or a “depreciation reserve.” Technically, a “depreciation reserve” is an accounting technique whereby a fund is built up from annual contributions, as an item
 
 *120
 
 of expense of operation, over a period of time representing the service life of a utility plant to offset and to equal in value the ultimate total loss through use of the utility property, so that at the end of such service life the depreciation reserve fund will replace the property so worn out by the various factors of depreciation. For ratemaking purposes, Sections 614-49 and 614-50, General Code, with the approval of the commission, authorize public utilities to set aside moneys for depreciation charges out of earnings. The cities in the instant case do not deny that a “depreciation reserve” is a proper item of expense of operation, but they insist that there should be at all times an equivalence or approximation thereto between the fund and the accrued depreciation throughout the service life of the plant. They claim that the reserve depreciation fund should not at any time grossly exceed the loss represented by observed and accrued depreciation. On the other hand, the company claims that such “depreciation reserve” should be built up according to studies designed to determine and provide an annual sum, which, on a straight line basis, will provide for the ultimate retirement of the plant, and which in the meantime will take care of all contingencies. See
 
 Lindheimer
 
 v.
 
 Illinois Bell Telephone
 
 Co., 292 U. S., 151, 167, 168, 78 L. Ed., 1182, 54 S. Ct., 658.
 

 The building up of the depreciation reserve on a straight line basis is more equitable as between one class of ratepayers enjoying service when the plant is new and subject to a small rate of depreciation and another class of ratepayers enjoying service when the plant is older and subject to a more rapid rate of deterioration. In the opinion of the court, the straight line basis of computation of depreciation reserve is more realistic, and a proper depreciation reserve should contemplate something more than an equiva
 
 *121
 
 lent to present or accrued depreciation. The contribution from expense of operation should be fairly regular over a period representing the service life of the plant. Of course, the depreciation reserve should not be built up to a point greatly in excess of the value of the plant when new, or in excess of its replacement cost. Such practice would place an unjust burden upon ratepayers.
 

 The cities claim, that the actual cost of the plant in service on the date certain was $274,954,974, and that accrued depreciation was 15.54 per cent of the cost or $42,687,192. The commission engineer’s report shows a depreciation reserve of $80,243,000, or an excess of $37,555,808 above the claimed existing depreciation. The cities claim that this excess reserve has been accumulated by excessive operating expense and that at no time in the foreseeable future will this excess reserve be absorbed in depreciation of the plant. The commission in passing upon this matter called attention to the rapid growth of the plant in the years immediately before the date certain. It found that the rate of growth of the property was 63 per cent from 1939 to 1947, and that the annual charges to the reserve were 3.90 per cent of the depreciable plant and property for the year 1947 and had continued at approximately the same rate for the years 1939 to 1946. The commission observed, in its finding, that the record discloses that from time to time the rates of accrual for depreciation of the various types of property are adjusted in the light of experience. The commission concluded its finding on this subject in these words:
 

 “Having regard for the rate of growth of the property, the rate of growth of the reserve, the method of determination and revision of rates for the respective classes of property and replacements of minor items of property through maintenance charges, the reserve accrued by the applicant company and the charges
 
 *122
 
 made for such accrual do not appear excessive.”
 

 In view of the finding of the commission as to facts relating to this phase of the controversy, this court cannot substitute its judgment for that of the commission.
 

 The cities make another contention relating to the treatment or use of funds represented by the “depreciation reserve.” Section 614-49, General Code, requires every public utilitiy to carry a proper and adequate depreciation or deferred maintenance account, whenever the commission shall determine that a depreciation account can be reasonably required. This section defines the depreciation reserve as follows:
 

 “The charge for depreciation shall be such as will provide the amount required over and above the cost and expense of maintenance to keep the property of the public utility in a state of efficiency corresponding to the progress of the art or industry. ’ ’
 

 From the language used in this section and Section 614-50, General Code, it is apparent that the property and equipment of a public utility must be maintained out of current earnings and that such maintenance must be charged to expense of operation. The language of the statute indicates also that in addition to the expense of maintenance the company shall set aside such a reserve depreciation fund as will at all times fairly equal the difference between the value of the property as it exists and the value as it would be if it were replaced new. In other words, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property, embracing wear and tear, decay, inadequacy and obsolescence, and it is proper to include in operating expense an allowance for consumption of capital in order to maintain the integrity of the investment devoted to utility service.
 
 Lindheimer
 
 v.
 
 Illinois Bell Telephone Co., supra.
 

 
 *123
 
 On the date certain, as hereinbefore stated, the depreciation fund amounted to $80,243,000. The record undisputably shows that
 
 this entire, amount has been expended by the company in capital improvements and,
 
 was on the date certain reflected in the property assets of the company and therefore
 
 was treated as a part of the rate base.
 

 The cities contend that at least the excess over the accrued depreciation ($37,555,808) and possibly all the depreciation fund ($80,243,000) should have been excluded from the rate base, or the commission should have ordered the company to credit the income from it to the depreciation fund.
 

 This court is of the opinion that there is merit to the contention of the cities in this respect to the extent that the value of the capital assets of the company have been augmented by new property purchased by the conversion of such portion of the depreciation reserve fund as was in excess of the amount of that portion of such fund as represented the actual or accrued. depreciation of the property, such excess fund so invested being approximately $37,555,808.
 

 The position of this court on this subject in previous cases has been a variable one. In the case of
 
 City of Cincinnati
 
 v.
 
 Public Utilities Commission,
 
 105 Ohio St., 181, 137 N. E., 36, the question of the proper treatment of a depreciation reserve was involved. The appellant in that case complained that the Public Utilities Commission erred in holding that the telephone company was “entitled to a return upon that portion of its property used and useful which is represented by additions, extensions and betterments to its plant and property constructed out of earnings set aside by said company from year to year for depreciation.”
 

 In that case the court, by a concurrence of four members, reversed the order of the Public Utilities Commission approving the rates, but, since the members
 
 *124
 
 of the court concurring in the reversal were unable to agree upon the grounds of the judgment, no authoritative opinion was written. Chief Justice Marshall, a majority member of the court, wrote a concurring opinion expressing his views as to the grounds of reversal, which opinion appears at pages 182 to 219, inclusive. As shown by that concurring opinion the Chief Justice based his holding of reversal upon the ground, among others, that the commission had no power to base the rate of return upon the capitalization of the depreciation reserve fund as a part of the rate base. See pages 198 and following.
 

 The Public Utilities Commission, misinterpreting the judgment of reversal in that case, instead of fixing reasonable rates, re-established the former rates. Again there was an appeal to this court by the company and that order was reversed. See
 
 Cincinnati & Suburban Bell Telephone Co.
 
 v.
 
 Public Utilities Commission,
 
 107 Ohio St., 370, 140 N. E., 86.
 

 The same cause was again before this court (113 Ohio St., 259, 148 N. E., 817) upon appeals of the city •of Cincinnati and the telephone company, the Public Utilities Commission having modified its order as to certain refunds but fixing the rates as in its order of August 1, 1920, which was the original order appealed from. The city made the claim that a depreciation charge should not be allowed on property acquired by means of the depreciation reserve fund and that since the utility carried upon its books a large amount for accrued depreciation, such amount should be deducted from the total valuation of the utility to the extent that such valuation had been increased by new construction and betterments made by the utility.
 

 This court, again by a concurrence of four members, affirmed in part and reversed in part the order of the Public Utilities Commission, holding:
 

 “In fixing the valuation of such physical property,
 
 *125
 
 actual depreciation at the time of inquiry should be considered. Where the books of the utility carry a reserve depreciation account largely in excess of the actual depreciation found and deducted by the commission, such excess should not also be deducted from the present reproductive cost.”
 

 Judge Jones in that case said:
 

 “In this respect the argument of the city is specious. Surely there can be no valid reason which requires those who were stockholders on August 1, 1920, to be penalized because the stockholders. of earlier years permitted the earnings to be placed in plant extension, instead of drawing them out in dividends. Likewise, should stockholders of earlier years receive heavier dividends than wise business policy permitted, this would not justify the requirement that present stockholders should suffer by a refusal to grant them a reasonable rate based upon the present fair value of the plant used and useful to the public. Nor would the fact that a deficit resulted, and stockholders received no dividends in former years, justify an unreasonable rate in 1920 in order to recoup the deficit sustained. An extreme case might be conceived, where, during a long term of years, by the liberal allowance of depreciation, the book item for ‘accrued reserve depreciation’ would become equal to the value of a newly built and larger plant, all of it constructed out of its meantime earnings. In such event could it be claimed that because the larger plant investment had been constructed and paid for out of the earnings of its original parent, covering a period of years, the public would be entitled to substantially free rates or charges because the new investments were paid for out of the former earnings?
 

 i
 
 < * * *
 

 “The claim of counsel for the city leads to a
 
 reductio ad absurd,um.
 
 If it be conceded that the rates paid by
 
 *126
 
 earlier consumers were higher than they should be, we are unable to see any valid reason why the present consumers should profit at the expense of the earlier. Had the former earnings of the utility not been expended in new construction and betterment of the plant, but still remained in its treasury to an amount in excess of necessary working capital, certainly such an amount would not enter into the valuation of the utility. It would not be part of the utility’s property ‘used and useful for the convenience of the public.’ It should not be added to the plant valuation as a basis to obtain an increase of rates. Likewise, should stock dividends be issued against such earnings, resulting in no addition to the plant, that would not affect its valuation, since its property would remain unchanged thereby. There is no evidence sustaining any claim that the so-called ‘reserve for accrued depreciation’ entered into the valuation or was considered part of the property. It was in no wise considered by the commission as a plant asset furnishing a rate base. Were we to consider the wisdom of a policy investing a utility’s earnings in its extensions and betterments, in order to meet the growing demands for the public service, we believe that would naturally be the wise and prudent policy whereby such earnings would be invested in the plant rather than paid out as dividends to stockholders. At best, the balance in the account ‘reserve for accrued depreciation’ is merely an item of bookkeeping. What the allowance for depreciation should be is usually left to the sound judgment of the utility. ’ ’
 

 This position was reaffirmed in the case of the
 
 City of Marietta
 
 v..
 
 Public Utilities Commission,
 
 148 Ohio St., 173, 74 N. E. (2d), 74, wherein this court held that even though a public utility carried on its books a reserve depreciation account in excess of actual depreciation, such excess should not be deducted from the reproduction cost of the utility property in determin
 
 *127
 
 ing a rate base. However, in that case the excess depreciation reserve had been invested in capital assets by a predecessor in title to the property and not by the utility whose rates were therein being determined. At any rate, in view of the facts in the instant case and in view of the holdings of other courts on similar questions, this court is of the opinion that this question should be re-examined by it.
 

 As to this excess of depreciation reserve over accrued depreciation in the instant case, the ratepayers have contributed to the company for its depreciation reserve a sum in excess, as of the date certain, of any actual or accrued depreciation. Under no justifiable reason could the company appropriate that amount of the fund not then needed to compensate it for loss by depreciation, make such excess a part of its capital assets and through purchase of additional property as a part of the rate base thereby increase the rate. This theory as to treatment of depreciation funds collected in excess of the actual or accrued depreciation is supported by the fact that under Section 614-50, General Code, when depreciation funds are “invested” the income from the investment must be credited to the depreciation fund and not to capital assets. On the other hand, that part of the depreciation reserve fund corresponding to the actual depreciation of the property when reinvested in the property takes the place of the lost capital assets of the utility and may properly be regarded as a part of the capital assets of the utility to preserve the integrity of its capital investment.
 

 In the case of
 
 Pioneer Telephone & Telegraph Co.
 
 v.
 
 Westenhaver,
 
 29 Okla., 429, 118 P., 354, 38 L. R. A. (N. S.), 1209, the court said:
 

 “As to the amount of expenditures made to take care of current repair and maintenance, there is no controversy; but appellant contends that it should be
 
 *128
 
 permitted to earn annually, in addition to the amount necessary to make current repairs, a sum sufficient to make good the annual depreciation, and to replace the parts of property when they become so deteriorated as to be no longer usable. All evidence is to the effect that there is at all times going on in a plant of this character a depreciation that cannot be overcome by repair. It is rare that any physical property impaired by time and use can be so repaired as to be equivalent to the same property new. There comes a time in the life of the physical units when they can no longer be made usable by repair, and they must be discarded and replaced by new properties, which requires the expenditure of capital. Such depreciation has been held by the federal Supreme Court to be a proper element of expense.
 

 “In
 
 Knoxville
 
 v.
 
 Knoxville Water Co., supra
 
 [212 U. S., 1, 53 L. Ed., 371, 29 S. Ct., 148], Mr. Justice Moody, speaking for the court, said:
 

 “ ‘Before coming to the question of profit at all the company is entitled to earn a sufficient sum annually to provide not only for current repair but for making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning.’ ”
 

 If this fund is exhausted by payment of dividends therefrom, then only the depreciated value of the property may be taken into consideration as a part of the rate base. But if the depreciation reserve representing actual depreciation has not been diverted to shareholders and is expended in replacements or bet
 
 *129
 
 terments to the plant, to the extent of such expenditure it should be regarded as a part of the original investment and be considered a part of the rate base.
 

 A similar question relating to an excess depreciation reserve fund was involved in the case of
 
 Railroad Comm. of Louisiana
 
 v.
 
 Cumberland Telephone & Telegraph Co.,
 
 212 U. S., 414, 53 L. Ed., 577, 29 S. Ct., 357, the headnote of which is:
 

 “Where a public service corporation raises more money in a particular year than required for actual depreciation it cannot carry the excess to capital for the purpose of estimating the amount on which it is entitled to pay dividends in determining whether a rate is unconstitutional as confiscatory, and the onus of showing that this has not been done is on complainant where the books show that such an excess has been collected.”
 

 Mr. Justice Peckham in that case said:
 

 “It was obligatory upon the complainant to show that no part of the money raised to pay for depreciation was added to capital, upon which a return was to be made to stockholders in the way of dividends for the future. It cannot be left to conjecture, but the burden rests with the complainant to show it. It certainly was not proper for the complainant to take the money, or any portion of it, which it received as a result of the rates under which it was operating, and so to use it, or any part of it, as to permit the company to add it to its capital account, upon which it was paying dividends to shareholders. If that were allowable, it would be collecting money to pay for depreciation of the property, and, having collected it, to use it in another way, upon which the complainant would obtain a return and distribute it to its stockholders. That it was right to raise more money to pay for depreciation than was actually disbursed for the particular year there can be no doubt, for a re
 
 *130
 
 serve is necessary in any business of this kind, and so it might accumulate, but to raise more than money enough for the purpose and place the balance to the credit of capital upon which to pay dividends cannot be proper treatment.”
 

 In the later case of
 
 Lindheimer
 
 v.
 
 Illinois Bell Telephone Co., supra,
 
 198, Chief Justice Hughes, speaking for the court on this subject, said:
 

 “While property remains in the plant, the estimated depreciation rate is applied to the book cost and the resulting amounts are charged currently as expenses of operation. The same amounts are credited to the account for depreciation reserve, the ‘reserve for accrued depreciation.’ When property is retired, its cost is taken out of its capital accounts, and its cost, less salvage, is taken out of the depreciation reserve account. According to the practice of the company, the depreciation reserve is not held as a separate fund but is invested in plant and equipment. As the allowances for depreciation, credited to the depreciation reserve account, are charged to operating expenses, the depreciation reserve invested in the property thus represents, at a given time, the amount of the investment which has been made out of the proceeds of telephone rates for the ostensible purpose of replacing capital consumed. If the predictions of service life were entirely accurate and retirements were made when and as these predictions were precisely fulfilled, the depreciation reserve would represent the consumption of capital, on a cost basis, according to the method which spreads that loss over the respective service periods. But if the amounts charged to operating expenses and credited to the account for depreciation reserve are excessive, to that extent subscribers for the telephone service are required to provide, in effect, capital contributions, not to make good losses incurred by the utility in the serv
 
 *131
 
 ice rendered and thus to keep its investment unimpaired, but to secure additional plant and equipment upon which the utility expects a return.”
 

 The status of a depreciation reserve is specifically provided for in Section 614-50, General Code. The statute indicates that the integrity of the fund shall be preserved for the purposes for which it is created and for no other purpose. “The moneys for depreciation charges thus provided for shall be set aside out of the earnings and
 
 carried as a depreciation fund.
 
 The moneys in such fund may be expended in new construction, extensions or additions to the property of the public utility, or invested, and if invested, the income from the investment shall also be carried in the depreciation fund. Such fund and the proceeds thereof, may be used for the purpose of renewing, restoring, replacing or substituting depreciated property in order to keep the plant in a state of efficiency. ’ ’ (Italics ours.) The statute evidently was intended to apply to a normal depreciation reserve fund and not to a fund largely in excess of the amount of actual depreciation. The statute specifically provides that the “fund and the proceeds or income therefrom shall be used for no purpose other than” by the statute provided.
 

 The cities claim that under Section 614-23, General Code, no part of the depreciation reserve fund may be capitalized and made a part of the rate base, but that the depreciation reserve is expressly excluded from the valuation of the property for rate-making purposes. On the other hand, the company claims that such capitalization is authorized by the statute. This difference of viewpoint arises from interpretations given to an ambiguous statute.
 

 The cities claim that, under the statute, the value added by reason of the necessity for making reservation out of income for depreciation shall be excluded
 
 *132
 
 from the rate base. In the opinion of the court, the statute simply requires that in fixing rates, the commission shall, with due regard to the value of the property and to the necessity of making reservation out of the income for surplus, depreciation and contingencies, fix and determine just rates, and the statute does not require the “depreciation reserve” to be either included or excluded from the rate base. The pertinent part of the statute, as this court interprets it, reads as follows:
 

 “* * * the commission shall, with due regard among other things, to the value of all of the property of the public utility actually used and useful for the convenience of the public, excluding therefrom the value of any franchise or right to own, operate or enjoy the same in excess of the amount, (exclusive of any tax or annual charge) actually paid to any political subdivision of the state or county, as the consideration for the grant of such franchise or right; and exclusive of any value added thereto by reason of a monopoly or merger and [with due regard] to the necessity of making reservation out of the income for surplus, depreciation and contingencies, and [with due regard to] all such other matters as may be proper, according to the facts in each case, fix and determine the just and reasonable rate, fare, charge, toll, rental or service to be therafter rendered, charged, demanded, exacted or collected for the performance or rendition of the seiwice * *
 

 This court, for reasons hereinbefore given, is of the view that the “depreciation reserve” to the extent that it equals the present or accrued depreciation of the property may be properly invested in new property and its value treated as a part of the rate base.
 

 However, such depreciation reserve to the extent that it exceeds the present or accrued depreciation of the utility property may not be invested in new or
 
 *133
 
 additional property and its value included and treated as a part of the rate base. In this respect, the commission should modify its finding and should adjust the rates in the instant case to reflect this reduction in the rate base. See
 
 Atlantic City Sewerage Co.
 
 v.
 
 Board of Public Utility Commissioners,
 
 128 N. J. Eq., 359, 368, 26 A. (2d), 71, 77.
 

 The cities complain that the company’s operating expense is too high and thereby results in an inadequate net income. One item of attack is the fee paid by the company to American for scientific research, licenses under patents, indemnity against patent infringment claims and suits, assistance in engineering, aid in securing funds and various other services. Prior to October 1948 the company paid American for this service a fee of one and a half per cent of the company’s gross earnings. Beginning October 1, 1948, this fee was reduced to one per cent of the gross earnings. The commission found that under the reduced rate the amount of this item based on the revenues of the company for intrastate services for 1947 was $723,428.28, and that this sum was the approximate cost of the service rendered by American to the company. Courts quite generally approve the allowance of such an item of expense.
 
 Alabama Public Service Commission
 
 v.
 
 Southern Bell Telephone & Telegraph Co.,
 
 253 Ala., 1, 42 So. (2d), 655;
 
 Southern Bell Telephone & Telegraph Co.
 
 v.
 
 Georgia Public Service Commission,
 
 203 Ga., 832, 49 S. E. (2d), 38;
 
 State, ex rel. Southwestern Bell Telephone Co.,
 
 v.
 
 Public Service Commission,
 
 262 U. S., 276, 67 L. Ed., 981, 43 S. Ct., 544;
 
 State, ex rel. Hopkins, Atty. Genl.,
 
 v.
 
 Southwestern Bell Telephone Co.,
 
 115 Kan., 236, 223 P., 771;
 
 State, ex rel. Pacific Telephone & Telegraph Co.,
 
 v.
 
 Department of Public Service,
 
 19 Wash. (2d), 200, 142 P. (2d), 498;
 
 Smith
 
 v.
 
 Illinois Bell Telephone Co.,
 
 282 U. S., 133, 75 L. Ed., 255, 51 S.
 
 *134
 
 Ct., 65;
 
 City of Cincinnati
 
 v.
 
 Public Utilities Commission, supra.
 

 The cities claim that an advertising expense of $771,958.58 allowed by the commission was excessive. In its finding on this item the commission said:
 

 "It is apparent that the determination of what a reasonable expenditure for this purpose should be is not subject to exact determination. We are unable to say that the company’s management has been unreasonable in this respect and therefore allow the expense.”
 

 In the case of
 
 Petition of New England Telephone & Telegraph Co.,
 
 115 Vt., 494, 66 A. (2d), 135, the court said:
 

 "The matter of * * * advertising expense calls for the exercise of judgment on the part of management of a public utility and while such expenses should be scrutinized with care by the Public Service Commission, they should not be disallowed unless it clearly appear that they are excessive, or unwarranted, or incurred in bad faith.”
 

 The cities contend also that the commission allowed too much as an expense item for pensions to employees of the company. The pension plan is voluntary as to the company and noncontributory as to its employees. The cities contend that this is an unusual plan in that the employees make no contributions to the pension fund and the whole burden becomes an operating expense of the company and ultimately a charge against the company’s ratepayers.
 

 Thé company’s pension fund is segregated and held in trust by a trust company. The pensions are processed and paid by the trustee. The fund is dedicated to pension purposes and cannot revert to the company. The plan is identical with that in effect in all other Bell system companies. The plan was instituted in 1913. In 1927, the company, along with all other
 
 *135
 
 Bell system companies, revised its pension plan to conform to the requirements specified for accrual accounting, established an irrevocable trust fund, and adopted the actuarial accrual method of providing for pension expense. The only pension cost capitalized is that pension cost involved in the actual construction of the plant and this in accordance with approved accounting. There is no confusion concerning the portion of the pension cost charged to operating expense and the portion charged to construction. This is required by the uniform system of accounting and the same treatment is accorded to social security and workmen’s compensation. See
 
 Alabama Public Service Commission
 
 v.
 
 Southern Bell Telephone & Telegraph Co., supra.
 
 Bell system pension costs have been allowed as operating expenses by commissions in other jurisdictions.
 
 State, ex rel. Pacific Telephone & Telegraph Co.,
 
 v.
 
 Department of Public Service,
 
 supra;
 
 Petition of New England Telephone & Telegraph Co., supra; State
 
 v.
 
 Tri-State Telephone & Telegraph Co.,
 
 204 Minn., 516, 284 N. W., 294.
 

 The commission found that “such [pension] plans are today considered as reasonably required and the costs thereof in reasonable amounts to be a legitimate expense in rate determinations. We therefore find that pension expense should be allowed in the amount claimed. ’ ’
 

 After reviewing the evidence and findings of the commission on the several challenged items of operating expense, we cannot hold that those findings are unreasonable or unlawful.
 

 The commission found that the proposed rates would provide a return of 5.67 per cent on a rate base of $291,416,835 which amount it found to be the value as of September 1,1947, of the company’s property, working capital, materials and supplies used in furnishing the service required, and that such rate of return was
 
 *136
 
 reasonable. It is impracticable to detail tbe evidence in support of facts upon wbieb this finding was made. In general, the company’s evidence tended to show that following tbe last world war tbe company’s earnings began to drop due to increased wages and cost of materials and that the loss of earnings was progressive. At tbe same time tbe company was engaged in a heavy building program required because of backed-up and new demands for telephone service. It was shown that tbe company’s program contemplated net additions to tbe plant costing from $137,000,000 to $181,000,000 for tbe period 1948-1951. Tbe evidence tended to show that a fair rate of return under tbe circumstances of tbe instant case must be approximately 6 per cent applied to reproduction cost new less existing depreciation of tbe company’s intrastate property. This evidence was not seriously contradicted by tbe single witness who was offered by the cities and who testified on that subject. Tbe increase of rates awarded to tbe company in this proceeding was tbe first and only general rate increase given it since those increases which followed tbe present company’s organization, tbe last of which became effective February 1, 1927. With tbe upswing of costs and prices since that date, tbe commission found that during tbe base period from June through November 1947, tbe company was earning slightly less than 3.85 per cent as of tbe date certain. Under these circumstances an increase of rates was inevitable.
 

 With tbe reduction of tbe rate base of $291,416,835, found by tbe commission, in tbe amount of the value of new property purchased out of tbe excess of depreciation reserve over tbe amount of actual depreciation of tbe company property, which tbe court finds should be eliminated from tbe rate base for reasons herein-before stated, with tbe consequent slight reduction in rates, there will result no unreasonable rate of return.
 

 
 *137
 
 The order of the commission is modified as to the determination of a proper rate base as indicated in this opinion and as so modified the order of the commission is affirmed.
 

 Order modified and, as modified, affirmed.
 

 Weygandt, .0. J., Matthias, Zimmerman, Stewart and Turner, JJ., concur.
 

 Taft, J., not participating.