CHESAPEAKE AND POTOMAC TELEPHONE
COMPANY OF BALTIMORE CITY *v.* PUBLIC
SERVICE COMMISSION ET AL.
PEOPLE'S COUNSEL ET AL. *v.* PUBLIC SERVICE
COMMISSION ET AL.
(Two Appeals in One Record)

[No. 92, October Term, 1952.]

*Decided December 5, 1952.*

The cause was argued before MARKELL, C. J., and DELAPLAINE, COLLINS and HENDERSON, JJ.

*Clarence W. Miles,* with whom were *William G. Gassaway, William B. Rafferty, Stephen H. Fletcher,* and *Miles, Walsh, O'Brien and Morris,* on the brief, for The Chesapeake and Potomac Telephone Company of Baltimore City.

*Joseph Allen, People's Counsel,* and *Ward B. Coe, Jr., Assistant People's Counsel,* for the People's Counsel.

*H. Donald Schwaab, Assistant City Solicitor of Baltimore,* with whom were *Thomas N. Biddison, City Solicitor, Edwin Harlan, Deputy City Solicitor,* and *Hugo A. Ricciuti, Assistant City Solicitor,* on the brief, for the Mayor and City Counsel of Baltimore.

*Charles D. Harris, General Counsel,* for the Public Service Commission of Maryland, *amicus curiae.*

HENDERSON, J., delivered the opinion of the Court.

The appeal in this rate case is from an order of the Circuit Court No. 2 of Baltimore City dismissing a bill of complaint filed by the appellant against the Public Service Commission of Maryland, except to the extent that certain relief prayed therein was granted, and remanding the case to the Commission for further proceedings. The bill of complaint had been filed pursuant to the provisions of Sections 359 and 415, Article 23 of the Code of 1939 (Sections 15 and 74, Article 78 of the Code of 1951), praying that paragraphs (1), (3)

and (4) of the Commission's order No. 48888 entered in case No. 5176 on March 11, 1952 be declared illegal and set aside. The Commission, the People's Counsel and the Mayor and City Council of Baltimore filed demurrers which were overruled. Answers were then filed by all parties. After the demurrers had been filed but before they were overruled, the People's Counsel and the City filed a cross-bill seeking to vacate the Commission's order on other grounds. Answers were filed by the Company and the Commission, the cases were consolidated and heard on bills and answers without the taking of additional testimony. The court dismissed the cross-bill, except to the extent that certain relief prayed therein was granted. The People's Counsel and the City appealed from this order and the Company also appealed. The court granted a stay of its orders pending appeal, conditioned upon the Company filing a bond in the amount of $1,000,000. An appropriate bond was duly filed and approved.

A preliminary question is raised by the cross-appellants, that their demurrers to the original bill should have been sustained on the ground that the Company could not appeal from those parts of the Commission's order that denied a rate increase to the full extent sought, and at the same time accept the benefits of the partial relief granted. To understand the contention made it is only necessary to quote the concluding paragraphs of the Commission's opinion: "We have found the rate base to be $118,279,156. We have determined that a rate of return from 5.75% to 6% is reasonable and fair. The Company should therefore be permitted to earn a net of from $6,900,000 to $7,100,000. It, therefore, appears that the Company requires at least from $300,000 to $500,000 additional net income to enable it to earn the rate of return which this Commission has fixed as fair and equitable. * * * the Company may reasonably expect additional gross revenue in the amount of $943,000 annually as the result of a 10¢ coin box charge. Giving effect to the current 52%

tax rate would result in increased net revenue of $452,640 which, in the opinion of the Commission, is sufficient to give the Company a reasonable return.

"The Commission is of the opinion that the Company should be permitted to increase its local coin box telephone call charge from 5¢ to 10¢ and that its application for increased rate in other respects should be denied."

The doctrine of election by the acceptance of benefits under a judgment is subject to certain limitations; as, for example, where there is no controversy as to the appellant's right to the amount for which the judgment was given. See note 169 A. L. R. 985. In the instant case the Commission found that the Company was entitled to the limited relief granted and the cross-appellants did not challenge the Company's right to that relief until after the demurrers had been filed. However, we think the doctrine is inapplicable on a broader ground.

Section 16(c), Article 78 of the Code of 1951 provides that "all orders of the Commission shall take effect within such reasonable time as it shall prescribe, and shall continue in force until its further order, or for a specified period of time according as shall be prescribed in the order, unless the same shall be suspended or modified, or set aside by the Commission, or be suspended or set aside by a court of competent jurisdiction."

Section 16(d) of the same article provides that "any company, corporation, association, person or partnership subject to any of the provisions of this sub-title or other person or party in interest, including the People's Counsel shall have the right to proceed in the courts to vacate, set aside or have modified any order of said Commission on the grounds that such order is unreasonable or unlawful, as hereinafter more particularly set forth."

It seems clear from these provisions, taken in connection with the provisions as to the finality of Com-

mission orders and the rights of immediate appeal contained in Section 55(c) and Sections 74 and 77, (*cf. Potomac Edison Co. v. Public Service Commission,* 165 Md. 462, 169 A. 480), that the orders of the Commission should normally take effect forthwith. In the absence of a stay by the Commission or injunction by the Court, we cannot find that an appellant has any option in the matter. It would seem to follow that an appellant should not be put to an election. If we assume, without deciding, that an appeal from an order opens for review the whole subject matter, to the extent that it is inseparable, it is still not incumbent upon an appellant to specifically object to every part of the order, if the complaint is only addressed to a part, particularly where a modification rather than a complete reversal is sought. In these respects the case of a utility, exercising a statutory right of appeal from the action of a regulatory administrative body, is distinguishable from the case of a private litigant. The cross-appellants have cited no case, in Maryland or elsewhere, that has applied the doctrine of election to appeals of the character under consideration.

In *Valparaiso Lighting Co. v. Public Service Commission,* 190 Ind. 253, 129 N. E. 13, 17, cited by the cross-appellants, the court stated that the doctrine of election and estoppel did not apply to orders of a commission establishing rates. It is true that the court also pointed out that the rates for gas and electricity, contained in the single order in that case, could be treated as separable, so that the decision was not as broad as the principle announced. However, in *Department of Public Utilities v. New England Telephone and Telegraph Company,* 325 Mass. 281, 90 N. E. 2d 328, 333, it was squarely held that the company could avail itself of a limited rate increase without abandoning the right to court review of the validity of the order. The practice has been followed without challenge in Maryland and elsewhere. *Cf. Public Service Commission v. United Railways Co.,* 155 Md. 572, 142 A. 870; *Hudson*

& *Manhattan Railroad Co. v. United States,* 313 U. S.
98, 61 S. Ct. 884, 85 L. Ed. 1212; *Lowell Gas Co. v.
Department of Public Utilities,* 324 Mass. 80, 84 N. E.
811, 813; *Alabama Public Service Commission v. South-
ern Bell T. & T. Co.,* 253 Ala. 1, 42 So. 2d 655; *New
England T. & T. Co. v. State,* 95 N. H. 353, 64 A. 2d
9; *Southern Bell T. & T. Co. v. Georgia Public Service
Commission,* 203 Ga. 823, 49 S. E. 2d 38.

The cross-appellants contend that under Maryland
law the Commission is not required to base rates on the
"fair value" of a utility's property. Under Section
55(a), Article 78 of the Code of 1951, (unchanged
since its adoption by chapter 180, Acts of 1910), the
Commission is directed, in an appropriate case, to
"ascertain the fair value of property of any corporation
subject to the provisions of this Article and used by
it for the convenience of the public." The cross-appel-
lants contend, however, that this section is limited in
its application and does not apply to rate making;
that the only standards for fixing telephone rates are
in Section 70(a) providing that rates be "just and
reasonable and not more than allowed by law or by
order of the Commission and made as authorized by
this sub-title." They argue that the words "just and
reasonable" should be construed as coextensive with
the requirements of the fourteenth amendment to the
federal constitution, as laid down in the latest Supreme
Court cases, to prohibit confiscation, not to prescribe
a valuation method.

We think the contention is unsound. In *Havre de
Grace Bridge Co. v. Public Service Commission,* 132
Md. 16, 27, 103 A. 319, 323, a rate case, the court
quoted Section 442 of Article 23 (now Section 55, Ar-
ticle 78 of the Code of 1951) and said: "What the
Commission in this case was authorized to ascertain
under the section referred to was the *fair value* of
the property." In *Miles v. Public Service Commission,*
151 Md. 337, 344, 135 A. 579, 582, 49 A. L. R. 1470,
the court said: "* * * the very purpose of authorizing

the Commission to ascertain the value of the property of the various public service corporations is to enable it to fix the rates which the corporation is permitted to charge the public for the service rendered." Again, in *Public Service Commission v. United Railways Co.*, 155 Md. 572, 579, 602, 142 A. 870, 872, the court said: "The central dominating question presented by the appeal is whether the schedule of rates promulgated by the Commission is insufficient to yield such income as will give to the Company a fair return on the value of its property. * * * In valuing the property for rate-making purposes, the Commission based its conclusion on present value and not upon its original cost, and in fact the case of *Harve de Grace Bridge Co. v. Pub. Serv. Comm., supra,* left it no alternative."

Upon the question of statutory construction we think these three cases are directly in point and controlling. If further support were needed, it could be found in the legislative references to fair value and value in chapter 180, Acts of 1910 and chapter 732, Acts of 1941, and in the uniform and consistent administrative recognition of the principle in the published opinions of the Commission. In the instant case both the Commission and the lower court recognized that the fair value concept was applicable by reason of the statute.

If "fair value" is the rule prescribed by the statute, as we hold, we are faced then with an inquiry as to the true meaning of those words. The appellant contends that the words amount to a legislative adoption of the rule recognized by the Supreme Court at the time when the statute was passed in 1910, that rates fixed by a state for a public utility must allow a reasonable return upon the present fair value of the property used for the public. The right of court review in rate cases, on an issue of constitutionality under the fourteenth amendment, was clearly recognized in *Chicago, M. & St. P. Railway Co. v. Minnesota,* 134 U. S. 418, 10 S. Ct. 462, 702, 33 L. Ed. 970, and *Reagan v. Farmers Loan & Trust Co.,* 154 U. S. 362, 14 S. Ct. 1047, 38

L. Ed 1014. The so-called "fair value" rule seems to have originated in *Smyth v. Ames,* 1898, 169 U. S. 466, 546, 18 S. Ct. 418, 434, 42 L. Ed. 819, where it was said: "We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation * * * must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property." It may be noted that this statement does not undertake to lay down any definite formula for the determination of value. In *San Diego Land & Town Co. v. Jasper,* 1903, 189 U. S. 439, 442, 23 S. Ct. 571, 572, 47 L. Ed. 892, the court said: "It no longer is open to dispute that under the Constitution 'what the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public.' *San Diego v. Nat City,* 174 U. S. 739, 757. That is decided, and is decided against the contention that you are to take actual cost of the plant, annual depreciation, etc. and to allow a fair profit on that footing over and above expenses. We see no reason to doubt that the California statute means the same thing. Yet the only evidence in favor of a higher value in the present case, is the original cost of the work, seemingly inflated by improper charges to that account and by injudicious expenditures * * *. No doubt cost may be considered, and will have more or less importance according to circumstances."

In *Willcox v. Consolidated Gas Co. of New York*, 1909, 212 U. S. 19, 42, 29 S. Ct. 192, 196, 53 L. Ed. 382, the court reiterated the rule that there must be a fair return upon the reasonable value of the property at the time it is used for the public, even though the property has increased in value since it was acquired. It was indicated, however, that where "the material fact of value is left in much doubt", the court ought not to interfere.

The cross-appellants strongly contend that the fair value doctrine was repudiated by the Supreme Court in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U. S. 591, 64 S. Ct. 281, 282, 88 L. Ed. 333. In that case the court was dealing with a federal statute that did not mention fair value as the rate base but empowered the Federal Power Commission to fix "just and reasonable" rates. For present purposes it is not necessary to determine the exact scope or implications of the several opinions in that case. It may well be that the Supreme Court, following earlier intimations, did in that case abandon the test of fair value as an element of due process. See note 8 Md. L. R. 122, 126. Or it may be that the decision, instead of re-pudiating *Smyth v. Ames, sub silentio,* merely placed the emphasis on the end product or result reached, rather than the method employed, and in effect ex-tended the area of administrative discretion, within the limits of due process. In either event, we think the test of fair value is explicit in the Maryland statute, as construed by this court. *Cf. Northern States Power Co. v. Public Service Commission,* 73 N. D. 211, 13 N. W. 2d 779, 785. Whether it is implicit in the Maryland, as distinguished from the federal, constitu-tion, is a question we need not and do not now consider.

The appellant has cited no case, however, holding that in determining fair value any particular formula must be adopted, or that controlling effect must be given to reproduction cost, as compared to original cost. In its brief it is stated that the principal ground on which

it relies is "the Commission's failure to give adequate weight to reproduction cost." The cases of *McCardle v. Indianapolis Water Co.*, 272 U. S. 400, 408, 47 S. Ct. 144, 71 L. Ed. 316, and *Los Angeles G. & E. Corp. v. Railroad Commission*, 289 U. S. 287, 305, 53 S. Ct. 637, 77 L. Ed. 1180, relied upon by the appellant, both indicate that the determination of value is not a matter of formula, although consideration must be given to reproduction cost. In some cases, courts have expressed a preference for reproduction cost. *City of Marietta v. Public Utilities Commission*, 1947, 148 Ohio St. 173, 74 N. E. 2d 74, 79. In others it has been said that "the determination of fair value is not controlled by arbitrary rules or formulae, but should reflect the reasonable judgment of the Board based upon all relevant facts". *In re N. J. Power & Light Co.*, 1952, 9 N. J. 498, 89 A. 2d 26, 32. In that case the court affirmed the action of the Commission in rejecting as of insufficient weight all of the evidence as to present value.

We come, then, to the heart of the question presented by the Company's appeal, whether the Commission failed to give to reproduction cost the consideration required by the concept of fair value. The proceedings that culminated in the final order appealed from were initiated in 1946. On March 31, 1947 the Commission found the depreciated original cost of the intrastate property of the Company to be $63,487,491, and on September 30, 1951 to be $115,219,017. The difference of some 52 millions represents new capital put into the enterprise in modernizing and improving the plant. The cross-appellants contended for a lower original cost figure. The appellant produced evidence to show that the depreciated reproduction cost of the Company's property on the latter date was at least $140,446,097. The Commission found the fair value of the property on the latter date to be $118,279,156, or $3,060,139 in excess of the original cost claimed by the Company.

The Company argues that its estimate of reproduction cost was conservative and designed to meet the objections raised in the prior hearings. The basic current cost study was made in 1946, revised in 1948 to meet certain criticisms of the Commission, and brought to date by adding gross additions at book cost, although labor and material prices were materially higher in 1951. Plant retirements and the book increase in depreciation reserve were then deducted. The People's Counsel strongly urged that these deductions were wholly inadequate. The only estimates that were before the Commission were those of the Company, but the bases of the conclusions of the expert witnesses were vigorously attacked.

Estimates of reproduction cost are conjectural at best, not merely because they rest on opinion, but for the obvious reason that probably no plant would ever be reproduced in its present form. Even the physical structures to replace the old would be designed, so far as possible, to compensate in efficiency and convenience for the higher construction costs. *Cf. Schreiber v. Pacific Coast Fire Insurance Co.,* 195 Md. 639, 645-646, 75 A. 2d 108, 111, 20 A. L. R. 2d 951. In regard to plant equipment, the increased cost of reproduction would likewise be measurably offset by the technological improvements constantly discovered and introduced to meet the rising costs of labor and materials. One result is that equipment becomes obsolete before it wears out. The fact that evidence as to a substitute plant has been held irrelevant, *McCardle v. Indianapolis Water Co., supra,* does not mean that the Commission must close its eyes to the obvious in weighing evidence of reproduction cost.

There can be no doubt that the Commission took these factors into account. In its earlier opinion, reaffirmed in the opinion filed in 1951, it said:

"In its major aspect, reproduction cost is an estimate of the cost of producting the same plant at the same locations and constructed of the same materials at

the current prices of labor and materials. It obviously would normally take a long time to duplicate such a utility, usually estimated at three to five years, during which period, *in normal times,* the price of both labor and materials may increase or decrease to a considerable extent. It involves duplicating items of equipment and even buildings which are virtually obsolete and ready to be discarded, for many of which presumably the patterns, molds and dies have been destroyed and could not be reproduced except at a prohibitive cost. In short, it is a theoretical reproduction of something which, as a practical matter if it did not exist, would not be produced in its present form and locations. As this highly theoretical process has questionable probative value in times of normal and stable economy, it has even less value at the present time. And the latter is particularly true with respect to the instant utility.

"As heretofore mentioned, the Company is engaged in a major transition from manual to dial equipment. It has a large backlog of orders for telephone service which requires an enlargement and, to a large extent, rearrangement of some of its present facilities. Many of its buildings and much of its equipment is presently to be discarded. New buildings are to be (some are in process) constructed and new equipment is to be installed and substituted for old, all of which will involve the expenditure of a huge sum of money, estimated to be $47,000,000 during the years 1947 and 1948 and $90,000,000 during the next five years. These enormous changes strongly indicate that there would be very little reality involved in undertaking to determine value from an estimate of the current cost of reproducing the entire plant."

At the time of the final order the Commission noted that huge expenditures had been made at post-war prices, but that a large construction program was still ahead, including extensions and changes in the type of services, the heaviest expenditures to date having

been in "back-bone" plant. The extent to which additions and improvements, in the light of an expanding demand for services, might result in a greater margin of profit is of course problematical and incapable of demonstration. Equally problematical is the prediction of the experts that current prices, at an all-time high, are likely to continue upward.

The inherent weaknesses in estimates of this character have been fully recognized by the courts. See *Georgia Railway & Power Co. v. Railroad Commission,* 262 U. S. 625, 629, 43 S. Ct. 680, 67 L. Ed. 1144; *Los Angeles Gas & Electric Corp. v. Railroad Commission,* 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180; *Railroad Commission v. Pacific Gas & Electric Co.,* 302 U. S. 388, 58 S. Ct. 334, 82 L. Ed. 319; *New Jersey Power & Light Co. v. State, supra; New England Tel. & Tel. Co. v. State,* 95 N. H. 353, 64 A. 2d 9. In these cases estimates of reproduction cost were totally rejected. In the instant case it is indisputable that the Commission did give weight to the estimates of reproduction cost, to the extent of over $3,000,000 above the Company's original cost.

There are two schools of thought as to the scope of judicial review of questions of fact in a rate case, where the rates are claimed to be confiscatory under the fourteenth amendment. The opposing views are well stated in the majority and minority opinions in *St. Joseph Stockyards Co. v. United States,* 298 U. S. 38, 56 S. Ct. 720, 80 L. Ed. 1033, although the whole court was in agreement that the findings should be sustained. Under one view findings of fact made by a rate-making body, as in the case of other administrative bodies called on to determine value, are final, at least in the absence of a clear showing that they are unsupported by substantial evidence or otherwise unlawful. Under the other view, it is said that there is a judicial duty to exercise an independent judgment on the facts on a constitutional question, *e.g.,* of confiscation, or a jurisdictional question. But even

here it is recognized (p. 53) that this "does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence", and that there is a "zone of reasonableness". We find it unnecessary to choose between these theories in the instant case. Under either view we cannot find on this record that the Commission failed to give proper consideration to the evidence of reproduction cost. Nor does it follow that an error in judgment on the part of the Commission would necessarily be fatal to the Company. As stressed by the New Jersey court in the case cited, experience and not prophecy is the final test, and if the rates prove to be confiscatory, the Company is not without remedy. *Cf. Baltimore Transit Co. v. Hessey,* 196 Md. 141, 75 A. 2d 76; *Hessey v. Capital Transit Co.,* 193 Md. 265, 66 A. 2d 787, 10 A. L. R. 2d 1114, and *Capital Transit Co. v. Bosley,* 191 Md. 502, 62 A. 2d 267.

The appellant further contends that the Commission erred in disallowing its claim that the cash on hand as of September 30, 1951 be allowed as a part of the rate base as cash working capital. That such an allowance is a proper one has long been accepted. *Cf. C. & P. Telephone Co. v. West,* D. C., 7 F. S. 215, 234; and *City of Columbus v. Public Utilities Commission,* 154 Ohio St. 107, 93 N. E. 2d 693, 697. It is usually based on the assumption that there will be a time lag between the performance of the service and the actual collection of revenues therefor. A flat allowance estimated at thirty days may yield to a showing that the lag is not so great. *City of Norfolk v. C. & P. Telephone Co.,* 192 Va. 292, 64 S. E. 2d 772, 780. In the instant case the Commission found the weighted average time lag to be 23.2 days. "While much service is billed in advance, it manifestly is impossible to bill for toll service and excess local calls until after the service is given." The Commission found the weighted average lag in payment of operating expenses was a negative figure of 1.8 days.

However, the Commission found that "taxes, especially federal income taxes and excise taxes, have become a most important factor in connection with the determination of the Company's need for cash working capital. * * * Taking into account all classes of taxes, it is found that, on the average, there is an elapsed time of 274.5 days in their payment. Reducing this to a dollar-day basis, and combining it with operating expenses, we arrived at the figure of 67.5. Subtracting the revenue receipt lag of 23.2 days from the operating expense plus taxes lag of 67.5 days produced a net revenue receipt lag of minus 44.3 days. This demonstrated * * * that the Company received, on the average, money from its customers for services rendered before, in the ordinary course of its operations, it pays the cost of providing the service and that, therefore, there is no need for an allowance for cash working capital."

The appellant attacks this conclusion on the ground that it is an adoption of the so-called "alternative funds" theory, that funds collected from consumers for the payment of taxes are available for use by the Company until the taxes are paid. It argues that the fallacy in the reasoning is that it presupposes that revenues collected are contributions by the customers and that if such revenues are used as cash working capital it is the customers who are furnishing them. Actually, it argues, the customers are paying for services, and when bills are collected they become the property of the Company, citing *Board of Public Utility Commissioners v. New York Telephone Co.*, 271 U. S. 23, 31, 46 S. Ct. 363, 70 L. Ed. 808. Thus all of the funds collected are risked by the investors, not by the tax collectors or the customers.

We think the theory does not depend, however, upon the question of risk or ownership, but upon the fact that rates are calculated to yield a profit over and above taxes and the tax burden is shifted to the customers. Since these advance payments are available

for current use until they become payable to the taxing authorities, there is no need to allow earnings upon a cash balance without regard to tax accruals. If allowed, there would be a duplication in a charge already made against the rate-payer. This seems to have been the view taken by the Supreme Court of Pennsylvania in a recent case. *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 370 Pa. 305, 88 A. 2d 59. See also *Citizens Tel. Co. v. Public Service Commission*, Ky. 247 S. W. 2d 510, 513. We find no error in the Commission's disallowance under the circumstances.

The cross-appellants contend that the Commission erred in approving as a part of the annual operating expense the sum paid by it under the license contract with the American T. & T. Company. They argue that there is no relation between the amount paid (1% of the gross revenues) and the value of the service rendered. But it does not follow that the amount paid is excessive as of the valuation date. It would be extremely difficult to say, for example, what part of a particular dollar, spent by the parent Company for research, actually went to the benefit of the Maryland Company or any other Bell System company. Nevertheless, cost allocation studies have been made, the matter was carefully studied by the Commission, and its conclusion that the payments were not unreasonable is clearly supported by the evidence. The standard contract used has been widely approved by the courts. *City of Norfolk v. C. & P. Telephone Co., supra; Alabama Public Service Commission v. Southern Bell T. & T. Co.,* 253 Ala. 1, 42 S. 2d 655; *Pacific T. & T. Co. v. Public Utilities Commission,* 34 Cal. 2d 822, 215 P. 2d 441; *Southern Bell T. & T. Co. v. Georgia Public Service Commission,* 203 Ga. 832, 49 S. E. 2d 38; *City of Columbus v. Public Utilities Commission,* 154 Ohio St. 107, 93 N. E. 2d 693; *Pacific T. & T. Co. v. Flagg,* 189 Or. 370, 220 P. 2d 522; *Southwestern Bell Tel. Co. v. State Corporation Commission,* 169 Kan. 457, 219 P. 2d 361.

The cross-appellants contend that the Commission's action in fixing the rate of return was unreasonable and unlawful, because it did not consider or give weight to the Company's failure to achieve tax savings by the use of a different capital structure. The Company is, of course, a wholly-owned subsidiary of the American T. & T. Company, which owns virtually all of its stock. Under this setup the local Company pays income taxes at the rate of 52% of its earnings, which would be considerably reduced if a part of its investment was in interest-bearing securities. It may be noted that the Company does have certain short-term borrowings from the parent Company. Dividends paid to the parent Company are taxable at a lower rate. The effect is to shift a part of the total tax burden from the stockholders of the parent Company to the local telephone users. The appellant argues that this result is due to a federal tax policy that puts a premium on borrowed capital, not to any unsoundness or improvidence in the Company's policy, as laid down by the management, over which the Commission has no direct control.

If we assume, without deciding, that the Commission was legally bound to consider and give weight to possible or hypothetical savings in fixing the rate of return, we think it is clear that they did so in the instant case. Both of the experts who testified in the case as to the cost of capital, based their conclusions on an assumed ratio of debt to equity capital, not on the actual ratio. The Commission adopted the highest of these, as proposed by Dr. Thatcher, called by the appellees, a ratio of 45% debt and 55% equity capital. It found a rate of return of from 5.75 to 6% to be reasonable. In so doing it virtually adopted Dr. Thatcher's recommendation. Dr. Thatcher testified that he took into account the impact of the federal tax rates in fixing a proper debt ratio. While conceding that the determination of whether debt or equity capital should be issued was for management, the Commission said: "Still, the Commission, in fixing a rate of return, has the right

to determine what the effect thereof will be on the consumers. While having no power to direct the issuance of bonds instead of stock, we can say that the consumer should not be required to pay more than he would have to pay if the Company had availed itself of an appropriate debt-equity capital structure. So, this Commission must take note of the fact that the Company has no debt capital, but rather issues equity holdings to American which, in turn, creates its own debt capital, thereby permitting American to make a tax saving which would inure to the benefit of the Company, if it issued its bonds instead of equity capital." There was evidence in the case from which the Commission could have found that a higher rate was justified. The rate fixed, 5.96%, is one of the lowest in the nation. In adopting the lower rate it took into account the unfavorable aspects, from the consumers' point of view, of the existing capital structure. We cannot find that the Commission's action was beyond the zone of reasonableness.

*Order reversed and bill and cross-bill dismissed, costs to be paid by the respective appellants.*